# Illinois Official Reports

## Appellate Court

---

### *People v. Patterson*, 2013 IL App (4th) 120287

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DUWON L. PATTERSON, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0287 |
| Filed | December 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder was upheld over his contentions that his prior interviews with the police, statements regarding his use of guns and knives, and the testimony of two women who said they had been assaulted by defendant were improperly admitted in evidence, since the trial court did not abuse its discretion in allowing the jury to hear the prior interviews, the interview containing his inculpatory statements was highly probative and relevant to defendant's explanation that the victim's death was an accident, and defendant's involvement in prior acts of domestic violence was relevant to prove the absence of mistake. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 08-CF-1160; the Hon. Peter C. Cavanagh, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Ryan R. Wilson, all of State Appellate Defender's Office, of Springfield, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Presiding Justice Appleton and Justice Holder White concurred in the judgment and opinion.

## OPINION

¶ 1    In November 2008, a Sangamon County grand jury indicted defendant, Duwon L. Patterson, with first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2008)). In December 2011, a jury found defendant guilty of first degree murder. In March 2012, the trial court sentenced defendant to 55 years' imprisonment.

¶ 2    On appeal, defendant argues he was denied a fair trial because the trial court improperly allowed other-crimes evidence and the jury was allowed to infer he had a propensity to commit crime. Defendant argues the trial court erred in admitting (1) unredacted police interviews from November 13, 2008, and November 14, 2008; (2) statements regarding defendant's use of knives and guns; and (3) testimony of two women who claimed defendant previously assaulted them. We disagree and affirm.

¶ 3                    I. BACKGROUND

¶ 4    In November 2008, a Sangamon County grand jury indicted defendant for the first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2008)) of Tina Cathey.

¶ 5                A. The Pretrial Motion *In Limine*

¶ 6    On November 28, 2011, the first day of trial, defendant filed a motion *in limine* asserting the State sought to introduce "police reports" from 2008 mentioning defendant. Defendant also filed a motion to prevent the State from impeaching him with his prior convictions. This motion is not at issue in this appeal.

¶ 7    The State informed the trial court it intended to present evidence based on three police reports: (1) an incident occurring on May 28, 2008, where a woman alleged defendant, who

according to the State was her boyfriend, battered her in the driveway; (2) an incident occurring on June 3, 2008, where Robin Freemon alleged defendant, who according to the State was then Freemon's boyfriend, battered her in her residence; and (3) an incident occurring on June 12, 2008, where Surrebea Tramble, who then had a domestic relationship with defendant, alleged defendant battered her and held her at gunpoint. Defense counsel argued the case did not present "an issue of who did it, but it's what was his intention" and added defendant "meant to hit her" but "he didn't mean to kill her." The trial court ruled "when, as in here, the evidence of misconduct is offered to prove intent or perhaps most relevant, the absence of mistake, the mere general area of similarity would suffice" and denied defendant's motion *in limine* about the police reports.

¶ 8                                      B. Defendant's Jury Trial

¶ 9         During opening arguments, defense counsel conceded defendant hit Tina but argued she died as a result of his attempts to remove her from the area by picking her up and carrying her over his shoulders.

¶ 10                                      1. The Day of the Murder

¶ 11        Tina, a 31-year-old female who was approximately 4 feet 9 inches tall, and weighed 100 pounds, was involved in a romantic relationship with defendant. She was staying with her friend, Jessica Estes, on Little Court in Springfield, Illinois, in November 2008. During the evening hours of November 11, 2008, several individuals, including defendant, were at Estes's house. Estes testified defendant and Tina were arguing over Tina's cell phone. She testified defendant saw a number for one of Tina's former boyfriends in the phone. This led to a series of arguments and defendant leaving and then returning to the house. The last time defendant returned, defendant took Tina's cell phone off a table and left. Tina called the police at approximately 5 a.m. on November 12, 2008, to report her phone was missing.

¶ 12        Tina's daughter testified on the morning of November 12, 2008, she and her mother were outside of their residence and defendant was near the garbage cans. He had Tina's cell phone in his hands. Tina told defendant to give her the phone back and then defendant choked her around her neck. Tina snatched the phone, and then defendant knocked the phone out of her hands onto the ground. Tina's daughter went inside to call the police. When she returned outside, she could hear defendant hitting her mother. She heard four or five punches.

¶ 13                2. The Missing Persons Investigation and November 13, 2008, Interview

¶ 14        A missing persons report was filed at 4:23 p.m. on November 12, 2008. The next day, the police, while investigating the report, learned defendant was the last person seen with Tina. When police entered the residence where defendant was sleeping, they observed defendant's head sticking out of a pile of clothes between a washer and dryer. Defendant requested the police to keep the handcuffs on him because "he didn't trust the police in Chicago. They beat you down."

¶ 15       Cheryl Williams and Gerald Felts, investigators for the Sangamon County sheriff's department, interviewed defendant on November 13, 2008. This interview was video recorded and is approximately 1½ hours in length. The typed transcript is 54 pages long. It was played for the jury. We note the State's Attorney fast-forwarded through parts of the video, twice. The record does not reflect what parts of the video were and were not played for the jury.

¶ 16       Defendant's claim addresses various statements made during the interview, including the following (we note we have edited the interview for clarity):

"WILLIAMS: You've never put your hands on [Tina]?

DEFENDANT: A long, long time ago.

WILLIAMS: Okay, have you ever been arrested for–

DEFENDANT: For domestic?

WILLIAMS: Yes.

DEFENDANT: I ain't never been charged with domestic but I've been arrested for a domestic.

WILLIAMS: Okay. Have you ever been arrested for a domestic for hitting?

DEFENDANT: Females? No.

WILLIAMS: Tina?

DEFENDANT: No. Tina. No.

WILLIAMS: Okay. And no females. You've never been arrested and–

DEFENDANT: No. Only person I ever got a domestic violence charge is my mom ***.

* * *

FELTS: Okay, that's why when we came to the house we asked for you. They say you're not there. You're laying back there by a washer and dryer covered up you know. That's why we had to put handcuffs on you 'cause we hear that you like to fight with police. You said you like to fight police correct?

DEFENDANT: I like, no I don't fight with the police. I'm so use [*sic*] to the police beating my ass. Yes, I will fight the police back–so far as beating my ass down here yeah.

FELTS: That's why we handcuffed you.

DEFENDANT: Like they told me the last time 'We don't like n***rs like you. You think you tough.' You–I have to keep my thing. You're not going [to] just sit here and beat on me like the last time I was in. They beat my ass for what? For nothing'. ***

FELTS: Now did we treat you that way?

DEFENDANT: No, you all been cool so far.

FELTS: And you requested to keep your handcuffs on all the way here?

- 4 -

DEFENDANT: Yeah. 'Cause I don't know until we get here. Yeah and you all took 'em off so I'm cool."

¶ 17    Investigators asked defendant about his whereabouts on November 12, 2008, and where he stayed that night. Defendant explained he first went to Tina's house and then to a friend's house:

"FELTS: Where did you go in [the house]? Did you go back there and go to sleep on the washer and dryer over there?

DEFENDANT: Yeah, 'cause he asked 'cause earlier everybody keep talking about some uh, what's my sister say, talking about some right there that she's like 'I don't know what's going on.' So, I'm like 'Shit, I hope the police ain't still looking for me 'cause Tina knows where I'm at.' Tina's sending 'em into any crib I'm at. *** I went and I'm not gonna go to jail for no dumb shit. I'm tired of being in jail for dumb shit.

* * *

FELTS: Okay. Is there anything that you can think of that we might need to know about or that can help us try to find her?

DEFENDANT: (sighing)

FELTS: I'm afraid she's injured somewhere. She's hurt somewhere and that's why I'm trying to find out where she's at.

DEFENDANT: I don't know. I wouldn't even hurt *** Tina. I love Tina too much. Only thing I do is argue with her. We argue every fucking day. Every fucking day. I would never hurt Tina. For what? Why would I hurt Tina for?

WILLIAMS: Why would everybody think that?

DEFENDANT: 'Cause that's all, that's all the fuck she told 'He'll do this. He'll do this.' Well I'm just gonna the way your mouth is. Your mouth is flipper than momma and I don't even fuck with my momma. That's why I stay away from my momma, that's why I moved so fucking far. 'You're mouth is super flippy,' I tell her that 24/7, Tina 'Your mouth is too fuckin' flippy. Square it up.' ***

WILLIAMS: Have you ever hurt a female?

DEFENDANT: Hurt a female? No.

WILLIAMS: I was told you put a female in the hospital. She had a broken nose and jaw. ***

DEFENDANT: (laughing)

WILLIAMS: I mean, I'm just trying–

DEFENDANT: Okay, wait, wait, wait, wait, wait.

WILLIAMS: I'm just telling you this is the stuff I was hearing out here.

DEFENDANT: This is a fucking joke. This is a fucking joke. Wait a minute. What's the female's name that I'm suppose [*sic*] to do this on?

WILLIAMS: I can't even recall what her name is. I'm serious.

DEFENDANT: You got it. Should be on paper.

WILLIAMS: No, I'm not saying. I was just told that–

DEFENDANT: Well can you call whoever told you that and tell 'em the female that. Ain't no female can ever tell you that I broke her, her, her jaw.

* * *

[Defendant talking about the night before the murder]

WILLIAMS: Were you all drinking and just kicking it?

DEFENDANT: Everybody was drinking and kicking it. Everybody was in the house kicking it. Everybody except for Boo. Boo the only person that was in the house that was basically smoking some weed.

WILLIAMS: Okay.

DEFENDANT: Me, her, and Tonda. We was all smoking some little weed and that's it."

¶ 18    Defendant explained his efforts to hide from police on the morning of November 12, 2008, while police were looking for him and Tina's cell phone. Williams then asked why he took off his coat:

"DEFENDANT: Yeah, 'cause the police–I didn't want the police to keep trying doing. I'm gonna keep flipping clothes. Knowing they know he got on an orange jacket. Take that orange jacket off. Throw that orange jacket away. You can always replace that. Ain't got time to be sitting up in no county jail. I don't have time to sit in jail. I've been out of jail, out of the penitentiary too long. Straight up. To come back to jail? No. No.

WILLIAMS: What's, when did you go to the penitentiary?

DEFENDANT: I went to the penitentiary in '97.

WILLIAMS: For what?

DEFENDANT: Possession of a firearm.

* * *

FELTS: Well you're not going to jail. I told you that man.

DEFENDANT: I know man, that's how I feel.

FELTS: Well, you're getting out of here.

DEFENDANT: I'm gonna ride and get me a, I got a fucking gun. Nobody fucking run up on me and do nothin' crazy to me.

FELTS: Are you still worried somebody's gonna do something to you?

DEFENDANT: Hell yeah.

* * *

DEFENDANT: I'm the prime fucking suspect. I ain't no fucking dummy. Been here too fucking long. *** I'm the prime suspect [until] she pop up. This some dumb ass shit.

FELTS: Now listen, now listen.

DEFENDANT: I want my girl. Fuck that. I want her to walk through one of those doors and I'll be straight. *** When I go outside that door, I got to go get me some guns. So when n***a's run up, I'm not gonna go get killed. Man are you fucking crazy?

FELTS: What do you think her brothers are thinking?

DEFENDANT: Hell yeah, she missing. One of 'em already in this fucking building. How many people he did told? How many time he did call home? (Crying) And I'm down here by myself. It'd be different if I was in Chicago where all my n***rs at. ***

FELTS: You think something happened to her?

DEFENDANT: Man, hell yeah. She ain't never did no shit like this.

FELTS: Where would she go?

DEFENDANT: I don't know. *** Not gonna do nothing to my girl. I love her too much.

FELTS: Ain't nobody said you did do anything to her.

DEFENDANT: I don't care. You taking my clothes. I'm not goofy. I done been in homicide. And if you look at my background, I just beat out fucking attempt murder when I shot that dude. Man, I'm not playing today. ***

FELTS: [Suggests defendant go look for Tina.]

DEFENDANT: Man, I'm not finna [*sic*] be walking around. Them n***rs riding around in cars. I don't know nothing about they just put a n***a in the hospital. What are you talking about?

FELTS: Oh, well we're going to keep trying to look for her.

DEFENDANT: You, you got a gun. You let me carry your gun and give me your badge, so when they ride up I'm legit. I get called [*sic*] with this gun what you gonna do? Lock my black ass up. There go another charge."

The interview continued while defendant removed his clothes. Defendant continued to express fear of retribution from Tina's brothers. He asked police to take him to Chicago "till this blow over."

#### 3. Discovery of the Body

Police discovered Tina's body on November 14, 2008, in a wooded area. Police observed drag marks near the body.

#### 4. The November 14, 2008, Interview

##### a. Defendant's Second Motion *In Limine*

On December 1, 2011, defendant filed a motion *in limine* asserting the State sought to seek introduction of defendant's November 14, 2008, interview. Defendant argued the interview included "references to other crimes or bad acts unrelated to the charges," including (1) defendant's "background, and use of guns and not knives"; (2) defendant's

reference to "some 'dude' that he is possibly into an altercation with or could have an altercation with"; (3) "[r]eferences to guns"; and (4) a statement he does not kill women but will "slap" them.

¶ 24    The State argued this motion was untimely, as defense counsel had the interview for three years, and the interview was relevant for the purpose of "showing absence of mistake or accident." The State added it was important to hear the "entirety" of the statement rather than "piecemealing" things. We note during the discussion, defense counsel pointed out to the trial court items could be redacted manually, and said "We did it yesterday."

¶ 25    In ruling on the motion the trial court stated, as follows: "I think because the situation came up midtrial, it's a little awkward for the Court, especially considering the first statement having been already heard by the jurors. So in light of all of that, in light of the fact that I do find it's relevant and probative, the issue is whether or not it's more prejudicial. I think in light of the situation, that it is not more prejudicial in this case, and it is probative, and it is a complete statement, so I will allow it in."

¶ 26                                    b. The Interview

¶ 27    Before the interview was played for the jury, the trial court admonished the jury as follows: "Ladies and gentlemen of the jury, portions of the following taped interview of the Defendant references the Defendant's conduct other than charged in this case. This evidence has been received on the issue of claim of accident and may be considered by you only for that limited purpose." The interview was played for the jury. We note the full interview is approximately 2½ hours in length. The typed transcript is 79 pages in length.

¶ 28    The interview began with Williams and Felts explaining police found Tina's body and spoke to defendant's sister. They asked defendant to explain what happened. He stated "I tried to save her" and admitted he hit her. Defendant explained he and Tina were walking and talking and then she stopped and fell. He thought she was "faking" and told her to get up. He then tried to carry her out of the woods but she was "too heavy" and he waited with her body. He explained "It wasn't supposed to happen. Everything went wrong. I don't know what went wrong, maybe I hit her too hard." He told police he hit Tina "more than three" times.

¶ 29    The investigators asked why defendant did not previously tell them where Tina was. Defendant replied he thought she was "hiding out." He asked the cause of death and police responded the autopsy was not completed.

> "DEFENDANT: Well, can you all stay with me until they, can you all put me somewhere where I can be safe in this jail? Protective custody? Anything. I do not, I swear to God, I can't look at none of her friends. I don't wanna see nobody. I'm telling you, you put me in population, I'm gonna fuck one of these Sheriff's up. I'm telling you, I'm gonna go all out, I wanna be by myself in a hole. I do not wanna be around nobody when I'm in this shit until I get downstate. If I'm not, I'm telling you, I can't do it. I can't do it. You take me upstairs right now, I swear to God. I'm gonna get to fighting motherfucker. They are gonna get me the fuck off that deck every time they try to put me somewhere. I'll be fighting and keep fighting until I be by myself."

- 8 -

Defendant made approximately 10 similar statements where he threatened to assault someone until he was placed in the "hole" and removed from the general population.

¶ 30 Williams asked why defendant and Tina were fighting over Tina's cell phone.

"DEFENDANT: Uh, she steady keep calling this dude. Uh, for the last eight month. Dude–

WILLIAMS: You know who it is?

DEFENDANT: Yeah. I know Dude.

WILLIAMS: What's his name?

DEFENDANT: If I see him in jail we gonna tie this boy up. We gonna tie it up. Reno, that's his name. Soon as I see him I'm gonna smash him in the door. Ain't gonna be no talking. She gone. I'm gonna try my best to break his fucking neck.

WILLIAMS: How come you mad at him?

DEFENDANT: Because the simple fact is my whole life change. My life is fucking dead. I'm not, I'm not, I'm not even existing right now. I'm not even on the market. I'm dead, I'm dead. That's fucked up. I'm gonna die in jail the rest of my life and I deserve it. I don't care what nobody says. It's all because they like provoking and shit.

WILLIAMS: Who is 'they' that [are] provoking you?

DEFENDANT: Oh, Jessica has something to do with it. They all have. They all say 'woo woo' whatever they be mumbling and shit. They was mumbling that night but shit wasn't funny 'cause Tanda kept saying 'Leave that shit alone ***. D[uwon] calm down.' I'm like 'Alright G I'm gonna leave it alone and you all stay sitting across the table.' [People were sitting at the table] and Tina was standing at the corner of the table and they just went on. 'Yeah, fuck you *** woo woo. Well Dude gonna do this, Dude gonna do this. I'm gonna call Dude come over there and beat your ass.' Ain't that motherfucker gonna come over here and do shit. Alright, watch this, and that's when they left. So yeah, of course, I did go grab two knives, some right up on me. It's better than me calling saying for some of my guns."

¶ 31 Williams asked if defendant had any knives when he was arguing with Tina:

"DEFENDANT: I had some, I ain't gonna use 'em. Them knives for Dude *** not for her ***. What am I gonna stab her for?"

Williams continued and asked about the night before and defendant replied he grabbed two knives while everyone was arguing. Williams asked where the knives were. Defendant replied he did not know, and he "don't need no knife. You ever look in my background I don't use fucking knives. Only thing I use is guns. Use guns, I don't fuck with knives. I ain't got the balls to stab nobody."

¶ 32 Defendant said he probably hit Tina at least 10 times. He explained he hit her in the ribs because "I kn[e]w if I hit her in the face I [was] gonna bruise her up." He explained he tried to carry Tina out of the woods, and thought she was playing a "joke" on him. He talked about how long he sat with her:

"FELTS: You said you sat there till 2:30, 3 o'clock.

DEFENDANT: Man, I sat there damn near 3, 4, or 5 man. ***

FELTS: At that point when she wasn't moving, you didn't think.

DEFENDANT: Her heart was still beating all that that's what I'm saying man. All that, she just wouldn't fucking move. I ain't.

FELTS: So.

DEFENDANT: All the dirt I done. I don't sit and watch to see nobody fall. I'm out of there, when we gang banging and shit in the city. I'm not gonna, I'm just gonna shoot and keep it going. But that right there, oh that was something totally. That wasn't right. It wasn't suppose [*sic*] to happen. That's all I can keep saying. It ain't suppose to happen, but I deserve to be in jail. To rot in this bitch ***."

¶ 33 He believed Tina was faking injury, he said he did not believe he hit her hard enough to injure her and "I've hit other people probably I don't know [how] hard and done worse things to them, but they always got up and seemed to walk *** away." He added he "would break a dude's jaw quick" but would tell a female to "get out of my face [and] let me be."

¶ 34 Toward the end of the interview, Williams asked if defendant thought it was all right for a man to hit a woman. Defendant said "No" and explained he did it because of his "anger." Williams asked if women were attracted to defendant's "calm" persona. He replied:

"I got a good heart. I get my girls anything they want. ***

Anything so they ain't gotta go ask they [*sic*] family and all. I handle all that shit. I got that. *** Just give me a chance, I'm trying to do it. You don't want me to hide drugs in your crib. I honor that. You don't want me to have guns in your house. I honor that."

¶ 35                     5. The State's Pathologist's Testimony

¶ 36 Scott Denton, a forensic pathologist, testified he reviewed the autopsy report. He testified to bruises on Tina's knees, thighs, abdomen, chest, neck, and scalp. Her ninth, tenth, and eleventh ribs were fractured, and both lungs were collapsed. She suffered a "partial transection" to the liver, which caused internal bleeding in her abdomen. He testified approximately half a quart of blood was recovered from her abdomen. This was a significant amount of internal bleeding for a person of Tina's size. He noted abrasions were on her back and buttocks consistent with being dragged by her heels.

¶ 37 Denton opined Tina died from multiple blunt force injuries due to an assault. He added she would have died within minutes of the liver laceration. He did not find evidence of compressional asphyxia.

¶ 38                     6. Defendant's Statements on November 11, 2008

¶ 39 Brandy Bagwell was with defendant on November 11, 2008, in Petersburg, Illinois. She testified, "[defendant] was mumbling on a bunch of stuff, saying he thought Tina was cheatin' on him, *** and he said that if he ever caught her cheating, he would make her

watch him beat the guy to death and then beat her until she couldn't move, and then sit and wait for the police to come."

¶ 40                           7. Defendant's Former Girlfriends' Testimony

¶ 41    Before this evidence, the trial court admonished the jury with Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter, IPI Criminal 4th), including the admonishment it was for the jury to decide "what weight should be given to this evidence on the issue of accident."

¶ 42    Surrebea Tramble testified, on June 12, 2008, defendant came to her house where they "got into an altercation." Defendant proceeded to punch Tramble in her face and then pointed a rifle at her head and told her to lie down and not speak or defendant was going to kill her. Tramble was able to flee.

¶ 43    Robin Freemon testified, on June 3, 2008, defendant was sleeping on a couch at her residence. Freemon entered the residence with her six-month-old child and woke defendant. He became "irate" and they engaged in a "verbal altercation." Defendant grabbed Freemon's face and held it for "two, three minutes." She testified he told her "he would 'F' me up, and that I didn't know who I was messin' with."

¶ 44                           8. Defendant's Evidence

¶ 45    Jessica Bowman, a forensic pathologist, testified she performed the autopsy on Tina. She opined the liver could have been further injured if Tina's body was dragged, carried, or picked up. She opined the cause of death was a combination of compressional asphyxia and blunt force trauma.

¶ 46    Shaku Teas, a consulting forensic pathologist, testified she reviewed Bowman's autopsy report and Denton's report. She testified the abdominal injuries could have been caused by dragging. She opined the liver laceration was not life-threatening. Teas testified the injuries to the liver and collapsed left lung were consistent with two strikes to the rib area. She did not see evidence of compressional asphyxiation.

¶ 47                           9. Jury Instructions and Verdict

¶ 48    Defendant tendered an involuntary manslaughter instruction. After argument, the trial court noted defendant's evidence supported his theory of the case–Tina's injuries were accidentally aggravated by his attempts to move her. The court allowed the instruction. See IPI Criminal 4th Nos. 7.07 (definition of involuntary manslaughter) and 7.08 (issues in involuntary manslaughter). The court again admonished the jury with IPI Criminal 4th No. 3.14.

¶ 49    The jury found defendant guilty of first degree murder.

¶ 50                           C. Sentencing and Posttrial Motions

¶ 51    In December 2011, defendant filed a motion for a new trial. Defendant argued the trial court erred in denying his motion *in limine* and permitting evidence he "had hit women in the

past." Defendant also argued the court erred in denying his motion *in limine* filed during trial on the basis it was not timely filed. The trial court denied the motion.

¶ 52    In March 2012, the trial court held a sentencing hearing. The presentencing investigation report (PSI), showed a 1997 conviction for possession of a firearm, and a 1998 conviction for unlawful use of a firearm by a felon. The PSI stated defendant was charged in Cook County case No. 97-CR-1630402 with attempt (murder) and found not guilty in 1998. The court sentenced defendant to 55 years' imprisonment.

¶ 53    In March 2012, defendant filed a motion to reconsider sentence. The trial court denied the motion.

¶ 54    This appeal followed.

¶ 55                                   II. ANALYSIS

¶ 56    Defendant argues he was denied a fair trial because the trial court improperly allowed other-crimes evidence and the jury was allowed to infer he had a propensity to commit crime. Defendant argues the court erred in admitting (1) unredacted police interviews from November 13, 2008, and November 14, 2008; (2) statements regarding defendant's use of knives and guns; and (3) the testimony of two women who claimed defendant previously assaulted them. We address defendant's contentions in turn.

¶ 57              A. Review of Admission of Other-Crimes Evidence

¶ 58    "It is well settled under the common law that evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes." *People v. Chapman*, 2012 IL 111896, ¶ 19, 965 N.E.2d 1119. Permissible purposes for other-crimes evidence include motive, intent, identity, lack of mistake, and *modus operandi*. *Id.* Other-crimes evidence is admissible if it is part of a continuing narrative of the event giving rise to the offense, intertwined with the charged offense, or explains an aspect of the charge which would otherwise be implausible or inexplicable. *People v. Slater*, 393 Ill. App. 3d 977, 992-93, 924 N.E.2d 1039, 1052 (2009); *People v. Young*, 381 Ill. App. 3d 595, 601-02, 887 N.E.2d 649, 655 (2008). "When facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes." *People v. Collette*, 217 Ill. App. 3d 465, 472, 577 N.E.2d 550, 555 (1991).

¶ 59    Where other-crimes evidence is offered for a permissible purpose, such evidence will not be admitted if its prejudicial impact outweighs its probative value. *Chapman*, 2012 IL 111896, ¶ 19, 965 N.E.2d 1119; see also *People v. Dabbs*, 239 Ill. 2d 277, 289-90, 940 N.E.2d 1088, 1096-97 (2010) (elaborating other-crimes evidence may also be excluded if irrelevant, or offered in the form of a hearsay statement not meeting an exception to the hearsay rule). The admissibility of other-crimes evidence is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion. *Chapman*, 2012 IL 111896, ¶ 19, 965 N.E.2d 1119. To necessitate reversal, the other-crimes evidence "must have been a material factor in the defendant's conviction such that, without the evidence, the

verdict likely would have been different." *People v. Hall*, 194 Ill. 2d 305, 339, 743 N.E.2d 521, 541 (2000). In other words, the evidence "must be so prejudicial that the defendant is denied a fair trial." *People v. Pelo*, 404 Ill. App. 3d 839, 865, 942 N.E.2d 463, 486 (2010).

¶ 60                                 B. Defendant's Police Interviews

¶ 61       Defendant contends his two recorded interviews contained a "copious amount of prior bad act evidence" and their admission resulted in an unfair trial. He asserts these interviews were introduced without a motion *in limine* challenge or timely objection at trial, and his trial counsel was ineffective for failing to file such a motion or object at trial. The State thoroughly analyzes the complained-of statements in its brief and argues these statements must not be considered in isolation, and when taken in context the statements are not inadmissible or prejudicial other-crimes evidence. We agree with the State.

¶ 62                          1. Defendant's November 13, 2008, Interview

¶ 63       Defendant asserts his November 13, 2008, interview is a "salacious biography," which included the following statements: (1) "a discussion about his capacity for violence"; (2) he liked to fight with police; (3) he had a prior arrest for a "domestic"; (4) he previously broke a woman's nose and jaw; (5) he had a 1997 felony conviction for unlawful use of a weapon; (6) he had been "going to jail all [his] life" for "dumb shit"; (7) he wanted to obtain a gun; (8) he smoked marijuana; (9) he had been "in homicide" several times; and (10) he "beat" an attempt (murder) charge. Defendant does not argue the State expressly argued these statements showed defendant's propensity to commit crime. Rather, he contends this evidence caused the jury to have "a bleak opinion" of him.

¶ 64       We are not persuaded by defendant's argument the trial court improperly admitted the November 13, 2008, interview. Defendant concedes, he did not object to the use of this interview before the trial court. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)). He has forfeited his claim.

¶ 65       In light of this forfeiture, defendant argues counsel was ineffective for permitting the jury to hear the unredacted interview. A claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "Under this test, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. In *Henderson*, our supreme court clarified where an ineffective-assistance-of-counsel claim is based on trial counsel's failure to file a suppression motion, a defendant must demonstrate the unargued motion is "meritorious" and "a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id.* ¶ 15, 989 N.E.2d 192. Before addressing the merits of defendant's argument, our review of the record reflects the State fast-forwarded through two parts of the interview. The record does not indicate what sections were not

published to the jury. Defendant bears the burden of providing a record sufficient to support his claim, and any doubts arising from the incompleteness of the record will be resolved against him. See *People v. Lopez*, 229 Ill. 2d 322, 344, 892 N.E.2d 1047, 1060 (2008); see also *People v. Bew*, 228 Ill. 2d 122, 134, 886 N.E.2d 1002, 1009 (2008) (claims of ineffective assistance of counsel where the record on direct appeal is insufficient to support a claim of ineffective assistance of counsel are preferably brought on collateral review).

¶ 66    Turning to the merits, defendant's contentions are unpersuasive. Defendant has not identified a single instance where the State explicitly used any of these complained-of statements to argue he committed the murder because he has the propensity to commit crime. He attempts to present his statements out of context and in isolation in order to make many of the statements appear prejudicial. We have provided lengthy excerpts to place these complained-of statements in context. As the State argued at trial, there is a significant interest in not presenting police interviews in a "piecemeal" fashion. Context is paramount as it can explain the logic of the interview. Here, the context includes the fact the interview occurred the day after Tina's disappearance, before police found her body, and defendant continually denied knowing Tina's whereabouts. However, defendant repeatedly referred to himself as the "prime suspect" and exhibited fear of retribution for Tina's disappearance–both indicative of defendant's guilty conscience. This is also reflected in his statements about previously being in "homicide" and having "beat" a murder charge. When taken in context, these are exhibitions of his belief the police were collecting evidence against him and he was the "prime suspect." Defendant knows where the investigation is headed–he knows Tina is dead. Defendant's state of mind is apparent in his continued paranoia about what people might think. Several times he states he wants to obtain a gun to protect himself from people–primarily Tina's relatives–who might believe he did something to Tina.

¶ 67    As the context indicates, defendant is scared of what might happen to him when others find out Tina is dead. Several of the complained-of statements go to the events preceding Tina's disappearance and the police investigation. See *People v. Young*, 118 Ill. App. 3d 803, 808, 455 N.E.2d 845, 850 (1983) (continuing-narrative exception can apply to include statements relevant to the police investigation or which explain the circumstances surrounding defendant's arrest). This includes defendant's reference to "fighting" the police (which was actually an accusation of police brutality), his admission he smoked marijuana the night before the murder (recounting the argument leading to him taking her cell phone), and his references to a prior conviction (made in the course of explaining his attempts to flee from police). Defendant's statements about his "capacity for violence" and history of domestic battery are relevant in light of his later claim he mistakenly caused Tina's death. Further, the statement about defendant previously breaking a woman's nose and jaw is actually a denial any such incident occurred and is relevant to the police investigation as it shows defendant lying to police investigators (claiming he never hurt a female) the day after defendant killed Tina.

Defendant's attempt to misconstrue his own statements–which are often boasts, lies, or fears–as impermissible other-crimes evidence is unpersuasive. The trial court did not abuse

its discretion by permitting the jury to hear portions of this interview.

¶ 68                              2. Defendant's November 14, 2008, Interview

¶ 69        Defendant argues his November 14, 2008, interview contained impermissible other-crimes evidence which "further fueled [the jury's] contempt." He asserts the following statements were improper: (1) his "violent threats" against inmates and law enforcement; (2) he would need to carry a gun for protection if he was in public; (3) he had previously been in the Chicago jail; (4) he "would break a dude's jaw quick" but would not fight a woman; (5) he was involved in a gang shooting and was able to "keep it going"; (6) he smoked an ounce of marijuana and other drugs the night before his interview; and (7) he "kept drugs and guns in the houses of his love interests unless they requested that he not do so."

¶ 70        Defendant's contentions about the second interview are unpersuasive. Defendant's reliance on *People v. Jackson*, 399 Ill. App. 3d 314, 926 N.E.2d 786 (2010), is misplaced. In *Jackson*, the State argued Jackson murdered his aunt to support his drug use, but the State did not present preliminary evidence about Jackson's drug habit or financial condition. Therefore, the evidence was only relevant to show Jackson's propensity to commit crime. *Id.* at 321, 926 N.E.2d at 793. The First District noted the evidence of Jackson's guilt was not overwhelming, there was no confession, and no evidence connected Jackson to the murder weapon. *Id.*, 926 N.E.2d at 792. This case is very different.

¶ 71        The interview defendant is complaining about being prejudicial is his confession. This is highly probative and, again, there is a significant interest in not presenting this evidence piecemeal to the jury. A second significant difference is the State did not offer this interview for the purpose of showing motive, but to show defendant's admission of guilt, explanation of the events, and for absence of mistake.

¶ 72        In reviewing the complained-of statements, context is paramount to understanding the statements–which are part of a 2½-hour interview. Defendant's "violent threats" toward other inmates and law enforcement and statements about needing a gun are continuing expressions of his fear of retribution from Tina's relatives or friends. He wants to be protected and will do whatever he needs to do to be placed in isolation. Defendant's statement about breaking someone's jaw is relevant as it is part of his explanation of how hard he hit Tina and why he believed she was faking injury. He did not hit Tina as hard as he hit other people and those people walked away. This goes directly to whether he was aware his force would cause serious bodily harm to Tina. His statements about not fighting with women–which contrast to his admission he struck Tina–are relevant to his contention of mistake. Defendant's selective review of the interview is apparent in his presentation of the statement about being in a gang shooting. Taken in context, defendant's statement is an explanation of his actions, not a statement about being in a gang shooting. While defendant uses the terms "gang banging" and "shoot and keep it going," he is explaining the effect Tina's death had on him and why he stayed with her body. Defendant's statements about drug use the night before the

interview included the statement he sought to "ease [his] mind" by smoking marijuana. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 103 (distinguishing *Jackson* and concluding evidence of the defendant's drug use could be admitted to provide a narrative of the events before the murder). Defendant misrepresents his statement about leaving drugs and guns at his paramours' residences. This statement is actually his attempt to portray himself in a positive light as a caring boyfriend.

¶ 73                    3. Defendant's Instruction Argument Is Troubling

¶ 74      Defendant's contention the jury instructions were "insufficient" is troubling. Defendant theorizes "[i]t is impossible to suppose that not one juror yielded to the irresistible temptation to consider [his] prior bad acts as evidence that he committed murder." Contrary to defendant's assertions, a limiting instruction reduces the prejudice created by admitting other-crimes evidence. *Young*, 381 Ill. App. 3d at 601, 887 N.E.2d at 654. As our supreme court has stated, "[f]aith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system." *People v. Illgen*, 145 Ill. 2d 353, 376, 583 N.E.2d 515, 525 (1991). We do not share defendant's lack of faith.

¶ 75                       4. Defendant Cannot Show Prejudice

¶ 76      As we have shown, the context of these complained-of statements shows these statements are relevant to defendant's explanation Tina's death was an accident or merely innocent statements when placed in context. Further, the trial court instructed the jury in accordance with IPI Criminal 4th No. 3.14 to only consider other-conduct evidence for the purpose of accident and absence of mistake. This instruction cured any prejudice arising from admitting other-crimes evidence. *Young*, 381 Ill. App. 3d at 601, 887 N.E.2d at 654.

¶ 77                 C. Defendant's Statements Referencing Guns and Knives

¶ 78      Defendant argues his statements regarding the use of guns and knives during his November 14, 2008, interview were improperly admitted. He argues these statements were not relevant "to whether he committed involuntary manslaughter or murder." He adds "one black sharpie marker and ten minutes was all the court and the litigants arguably needed to ensure [defendant] was not prejudiced by the introduction of his irrelevant statements." The State responds these statements are about the events the night before the murder and are permissible under the continuing-narrative exception. We agree with the State.

¶ 79      Defendant's statements about guns and knives are part of the narrative of what occurred the night before the murder. See *Young*, 381 Ill. App. 3d at 601-02, 887 N.E.2d at 655 ("Other-crimes evidence is also admissible as part of a continuing narrative of the event giving rise to the offense."). An argument arose at the party, defendant grabbed two knives to protect himself if "Dude"–the person he suspected Tina was involved with–appeared. The party broke up and defendant left with the knives and Tina's phone. He denied obtaining the knives to injure Tina; they were for his protection. When viewed in context, these statements assist in showing the argument he and Tina were engaged in when he struck her was actually

- 16 -

an argument continuing from several hours before. Without knowing about the arguments, the beating might be viewed by the jury as if defendant became inexplicably angry with Tina and beat her. See *Slater*, 393 Ill. App. 3d at 993, 924 N.E.2d at 1052. The trial court did not abuse its discretion.

¶ 80 Defendant's contention these statements could have been redacted in "ten minutes" ignores two important considerations. As set forth above, these complained-of comments are interwoven into the narrative of the events preceding the murder and redacting them would create omissions and possible confusion. While a marker would work on the typed transcript, it would have no effect on the video played for the jury. As the trial court admonished the jury, the video, not the transcript, is the evidence.

¶ 81                                D. Defendant's Previous Girlfriends' Testimony

¶ 82 Defendant asserts the trial court erred by permitting Freemon's and Tramble's testimony about defendant's violence toward them. Defendant asserts (1) the trial court's analysis was "fatally flawed" because it did not explicitly balance the probative nature of the evidence against its prejudicial effect; (2) the evidence was not probative because it had "no bearing" on whether defendant "knew his action would cause death or great bodily harm"; and (3) "[h]ad the court properly weighed the probative value of this evidence against its prejudicial effect," the court would have granted defendant's motion to exclude the testimony. We disagree.

¶ 83 Defendant relies on *People v. Boyd*, 366 Ill. App. 3d 84, 851 N.E.2d 827 (2006), to assert he was denied a fair trial because "the record in this case does not demonstrate that the [trial] court considered whether admission of this evidence would constitute unfair prejudice" and this error denied him a fair trial. The record in *Boyd* did not show the trial court balanced the uncharged other-crimes evidence's probative relevance against its prejudice. *Id.* at 94, 851 N.E.2d at 838. While the First District stated this "was error," it concluded "[d]espite the trial court's failure to conduct an explicit balancing test," it was harmless error because of the "striking similarities" between the charged and uncharged conduct. *Id.* at 94-95, 851 N.E.2d at 838.

¶ 84 Here, the trial court noted this evidence could "dirty up the trial" but it was relevant to prove absence of mistake. The record reflects the court weighed the potential prejudice of this evidence against its probative value. While the trial court's ruling might not rise to a detailed articulation of the evidence's potential prejudice, it does reflect the court engaged in a "meaningful assessment of the probative value versus the prejudicial impact of the evidence" (*People v. Donoho*, 204 Ill. 2d 159, 186, 788 N.E.2d 707, 724 (2003)). This court reviews the trial court's decision for an abuse of discretion, not to reweigh the evidence.

¶ 85 A defendant's prior acts of violence against the victim, or a person within the same class of the victim, are admissible to negate a claim the victim's injury was accidental. *Illgen*, 145 Ill. 2d at 367, 583 N.E.2d at 520-21. "Where *** evidence of the defendant's involvement in another offense is offered to prove the absence of an innocent frame of mind or the presence of criminal intent, mere general areas of similarity will suffice." *Id.* at 373, 583 N.E.2d at 523. Defendant asserted he did not intend to kill Tina when he struck her and her injuries

were accidentally aggravated when he attempted to pick her up and carry her out of the secluded area. As such, his involvement in previous acts of domestic violence were relevant to prove absence of mistake. As the supreme court announced in *Illgen*, this evidence must only share "mere general areas of similarity" to be admissible. *Id.* As the State points out, the evidence presented at trial showed defendant, the night before the murder, told others if he ever caught Tina cheating he would beat the man to death and then beat Tina until she could not move and then wait for the police. This is similar to the testimony of defendant's previous girlfriends, who testified defendant could be quick to anger and would inflict physical harm on them. One girlfriend testified he became angry because she woke him while he slept on her couch. The other girlfriend testified he threatened to kill her with a rifle he held pointed to her head. See *People v. Nash*, 2013 IL App (1st) 113366, ¶ 23, 993 N.E.2d 56 (noting similarity of the defendant's previous attacks on his wife). This evidence shares more than a "general area" of similarity to the evidence defendant was angry with Tina–whether over suspecting her of cheating or otherwise–and went with her into a secluded area and beat her to death.

¶ 86      Defendant's suggestion the evidence of his conduct with other girlfriends was of reduced probative value because it occurred in June 2008, approximately five months before the murder, is unpersuasive. See *Illgen*, 145 Ill. 2d at 370, 583 N.E.2d at 522 ("[T]he admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged."); *Donoho*, 204 Ill. 2d at 184, 788 N.E.2d at 722 (affirming where the other-crimes evidence occurred 12 to 15 years before the conduct at issue and noting other cases affirming where evidence was over 20 years old). We expressly reject defendant's contention the prejudicial nature of this evidence was not "reduced" by the limiting jury instruction. The trial court did not abuse its discretion in permitting this testimony.

¶ 87                                         III. CONCLUSION

¶ 88      We affirm the trial court's judgment. We award the State its $50 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2012).

¶ 89      Affirmed.

- 18 -