2023 IL App (1st) 230235-U

No. 1-23-0235

Order filed December 11, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the Eighth Judicial Circuit, |
| Plaintiff-Appellee, | ) | Adams County, Illinois. |
| | ) | |
| | ) | |
| v. | ) | No. 21 CF 540 |
| | ) | |
| | ) | Honorable |
| TYLER RICHMILLER, | ) | Robert K. Adrian and |
| | ) | Timothy J. Wessel, |
| Defendant-Appellant. | ) | Judges, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for predatory criminal sexual assault of a child and criminal sexual assault over his contention that the trial court abused its discretion in admitting evidence of his acts of domestic violence.

¶ 2    Following a jury trial, defendant Tyler Richmiller was found guilty of two counts of predatory criminal sexual assault of a child and two counts of criminal sexual assault.[1] The trial court imposed consecutive sentences of 10 years in prison on each count of predatory criminal sexual assault of a child and 5 years in prison on each count of criminal sexual assault. On appeal, defendant contends that the circuit court abused its discretion in admitting evidence of defendant's acts of domestic violence at trial. For the reasons that follow, we affirm the judgment of the circuit court of Adams County.

¶ 3    The defendant was charged with two counts of Predatory Criminal Sexual Assault of a Child and two counts of Criminal Sexual Assault arising from sexual assaults against K.L. that occurred between October 5, 2018, and August 3, 2021.

¶ 4    On October 12, 2021, the State filed a motion *in limine* to admit propensity evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2020)), which authorizes the admission of evidence of uncharged sexual crimes against another victim under certain circumstances. Specifically, the State sought to admit the testimony of A.E., a "temporary household member," regarding sexual assaults committed against her by the defendant.[2] The State alleged that the sexual assaults of K.L. and A.E. occurred "at the same time," there was a high degree of factual similarity between the offenses, and the charges in both cases arose from the same investigation.

¶ 5    A "Comparison Chart" attached to the motion outlined each victim, her age, the charges, the nature of the "sexual penetration," the dates and places of occurrences, the relationship between

---

[1] Defendant's given name is also spelled Tylar in the record. We adopt the spelling of the notice of appeal.

[2] The defendant was charged with sexually assaulting A.E. in case No. 20-CF-521.

defendant and each victim, the dates that each victim disclosed the assaults and the reasons why each victim feared the defendant.

¶ 6      At the November 12, 2021 hearing on the State's motion,[3] the State argued that when the offenses occurred, A.E. was 13 years old and K.L. was 11 to 13 years old, the nature of the "penetration" was the same, the dates of occurrence were close in time, and each victim "was a family or household member" of defendant. K.L. feared defendant because he had committed acts of domestic violence against her and her family members. Similarly, A.E. had been sexually assaulted by defendant and witnessed his acts of domestic violence against K.L's family members. Moreover, the charges against defendant for sexually assaulting K.L. arose during the investigation of his crimes against A.E., *i.e.*, A.E. disclosed defendant's sexual assaults of K.L. in one of her CAC interviews. According to the defense, allowing A.E. to testify would be "extremely" prejudicial, essentially amounting to a "charged offense with no conviction" to be used against defendant, resulting in "the same jury trial twice."

¶ 7      In finding that "the probative value [of the evidence] outweighs the prejudicial effect," the trial court considered the proximity in time and the factual similarity between the offenses. The court ruled that the State would be allowed to present the testimony of each alleged victim in the other victim's case.

¶ 8      At trial, K.L. testified that she was born on October 5, 2007, and was currently 14 years old.[4] Her family included her mother Megan D., defendant, and four siblings. Although she called defendant "dad," he was not her biological father.

---

[3] The Honorable Robert K. Adrian ruled on the motion to admit other crimes evidence.
[4] The Honorable Timothy J. Wessel presided at trial.

¶ 9     When K.L. was in fifth grade, the family lived in Golden, Illinois and defendant worked at a hog farm. When K.L. was about 11 years old, defendant asked her to go to the hog farm with him to help him with his work. After showing K.L. how to "jerk off hogs" to obtain semen, defendant said that he wanted to wash his clothes, and stripped down to his boxers. Defendant then told K.L. to take a shower so that she did not "smell like a hog farm" when she got home. K.L did not want to take a shower, but defendant insisted.

¶ 10     K.L. entered one of two shower rooms, used the curtains to block off the area, and took her clothes off. Defendant asked to take a shower with her and she said no. Claiming that he could not use the other shower because it belonged to his boss, defendant "got in the shower with [K.L.]," unclothed, and began touching K.L.'s breasts, vagina, and butt. K.L. told defendant to stop, "freaked out," and ran out of the shower into a corner area where she crouched down and "balled up into a little ball with [her] head down." Defendant "got out of the shower and he picked [her] up, turned [her] around and raped [her] *** in the washroom *** by putting his penis inside [her] vagina." When defendant let her go, K.L. got dressed and ran to defendant's truck. Defendant threatened to kill K.L. if she told Megan D. what he had done.

¶ 11     After the hog farm assault, defendant began touching K.L.'s vagina and putting her head down and forcing her to "suck his dick" in the bedroom he shared with Megan D. She did not know "how many times" defendant did those things to her, but it was more than once.

¶ 12     When K.L. was "halfway through" sixth grade, the family moved to Quincy, Illinois. While living in Quincy, defendant sexually assaulted K.L. "every time [her] mom was at work." K.L. did not tell Megan D. about the sexual assaults because she did not want "to break her relationship up *** and she felt like [she] had done something wrong."

¶ 13    Over defense counsel's objection, K.L. testified that her brother, M.W., ran away from home because defendant "pulled a gun" on him. K.L.'s friendship with A.E. began when A.E. helped K.L. look for M.W. after he ran away. Later, M.W. and A.E. began dating and K.L. and A.E became best friends. Eventually, A.E. began living at K.L.'s home. While A.E. was living there, defendant made K.L. lick A.E.'s vagina while he watched. After that, "he started having sex with K.L. while [she] was continuing with A.E." During the time A.E. lived with the family, defendant "had sex with [K.L.] while [she] had to lick [A.E.'s] vagina." Defendant did something "sexually" to A.E. and K.L. when "they were in the bedroom together *** everyday." K.L. explained that "either he'd have sex with [A.E.] while I was in the bed or he'd have sex with me while she was in the bed."

¶ 14    At some point, K.L. heard Megan D. talking about a video. She was "really upset" and told A.E. "that she had to get out and go live with her mom." Prior to being sexually assaulted by defendant, K.L. considered him to be her "best friend," but "lost trust in him after everything." Regarding defendant's other acts of domestic violence, K.L. testified that defendant choked her, "smack[ed]" her across the face, and punched her arm and leg. He also called her a "b***," a "slut," a "ho," a "c***," and "any cuss word you could possibly think of." In addition, defendant assaulted her "little sister and *** little brothers," and told her that if she "told anybody or [her] mom about anything, he'd kill [her] or hurt [her]."

¶ 15    On cross-examination, K.L. acknowledged that she did not disclose that defendant "raped her" during her first Child Advocacy Center (CAC) interview. During the second interview, she denied being present at the hog farm and indicated that when she spent time with defendant, others were present. K.L. did not disclose the sexual assaults until her third CAC interview because she

was scared. K.L. was 11 years old at the time of the hog farm incident and 13 years old at the time of the third CAC interview.

¶ 16    M.W. testified that defendant began living with his family when he was 9 years old. Initially, M.W. had a good relationship with defendant and called him "dad" even though he was not his biological father. His girlfriend, A.E., moved into his family's home around Christmas 2020. M.W. took A.E. back to her own home a few months later, after seeing a video of A.E. "sucking" defendant's "dick."

¶ 17    M.W. stated that defendant "used to hit on us" for not cleaning or not doing what he said. Defendant "always" fought and argued with Megan D. and was physically abusive to her. M.W. often had "to stop [defendant] and pull him off before it got too bad." On one occasion, defendant "pulled a firearm on [M.W.]" because he had pulled him off Megan D. After this incident, Megan D. told M.W. "to run away" for his own safety. On August 3, 2021, K.L. told him "everything" that defendant did. M.W. "went right away and told [his] mom."

¶ 18    Megan D. testified that she and defendant lived together from 2014 to 2021 and shared two sons. Her other children had a good relationship with defendant and called him dad. While the family lived in Golden, defendant worked at a hog farm.

¶ 19    In December, 2020 (around Christmas), A.E. moved into the family home. In April 2021, Megan D. moved out because of daily physical and verbal fights with defendant. During the course of Megan D.'s relationship with defendant, he became more "controlling" and accused her of cheating or "talking" to other people. After Megan D. returned home in July, 2021, she "went through" defendant's phone and observed a three to six second video depicting A.E.'s mouth "around" a penis. When she asked defendant about the video, he said "nothing" was on his phone,

she was "crazy," and grabbed the phone. After this incident, M.W. took A.E. back to her family and Megan D. "was trying to leave with the kids." Defendant came out and "punched" a mirror off of his car to prevent Megan D. from leaving, and she returned to the house.

¶ 20     After talking to K.L. on August 3, 2021, Megan D. contacted the detective in A.E.'s case and took K.L. to the CAC. Prior to August 3, Megan D. followed defendant's instructions to "say there was no video or there was a video but it was [her] son in the video." She admitted that she lied to law enforcement about the video because she was afraid of defendant.

¶ 21     Kimberly Garey, a human resources employee with Professional Swine Management, confirmed that defendant worked at the hog farm from October 2017 to October 2019. Employees could access the farm during non-working hours using a door code. The farm was not staffed "24/7," and, generally, there was only a first or early shift, which began at 7 a.m. Garey did not know if the door code could be tracked or if the farm had cameras.

¶ 22     Quincy police department detective Erik Cowick testified that in July 2021, he met with A.E. at her mother's home. A.E. told him that there was a video showing her in a sexual encounter on defendant's phone. After observing A.E.'s CAC interview on July 22, 2021, Cowick talked to defendant at the police station. After being advised of his rights pursuant to *Miranda v Arizona*, 384 U.S. 436 (1966), defendant indicated that his birthdate was October 2, 1993, that A.E. had lived with his family for approximately six months, and that he was a distant cousin of A.E.'s mother. Defendant denied touching A.E. "inappropriately."

¶ 23     A.E. revealed that K.L. had also been sexually assaulted by defendant during the investigation of her case. K.L. did not initially reveal that she had been sexually assaulted by defendant. Upon receiving a "very emotional" phone call from Megan D. on August 3, 2021,

Cowick arranged a third CAC interview for K.L., during which she admitted she had been "sexually assaulted" by defendant.

¶ 24    Prior to A.E.'s testimony, the trial court admonished the jury that evidence would be received that defendant "has been involved in offenses other than that charged in the indictment" and that this evidence is being received "on the issues of the nature of the relationship between the parties and defendant's propensity to commit sex offenses" and may only be considered for those limited purposes. Over defendant's objection, A.E. testified that she was born on March 25, 2008, and moved in with K.L's family in December 2020, when she was 12 years old. While A.E. was living with K.L.'s family, defendant began touching her hand, calling her "pretty," and "doing little things." Defendant then started "doing things that [she] did not want [him] to do." Defendant began putting his penis in her vagina "everyday" and told her not to tell anyone. When defendant asked her to suck his penis, she did not want to but eventually complied. Defendant did the "same thing" to K.L. A.E. saw defendant having sex with K.L. because sometimes they were "right next to each other." During a trip to Las Vegas, defendant told A.E. that he and K.L. "do stuff together." He then did "it" to both A.E. and K.L. At some point, A.E. learned that a video depicting her sucking defendant's penis had been recorded without her knowledge.

¶ 25    A.E. never tried to leave K.L.'s house because she was "scared." She had seen defendant "put his hands on all of the kids," and she "didn't want to be hurt." In July 2021, Megan D. made her leave after seeing the video. She did not immediately tell her mom what happened, but eventually spoke to detective Cowick and had several CAC interviews. During her second CAC interview, she "told them what had happened with [K.L.]."

¶ 26    Following closing arguments, the trial court again instructed the jury that evidence that defendant was involved in offenses other than those charged in the indictment related to "the relationship between the parties and the defendant's propensity to commit sex offenses" and could only be considered for "those limited purposes."

¶ 27    The jury found defendant guilty of two counts of predatory criminal sexual assault of a child and two counts of criminal sexual assault.

¶ 28    Defendant filed a posttrial motion alleging, in relevant part, that the trial court erred in allowing A.E.'s testimony, which constituted evidence of uncharged incidents of domestic violence. The trial court denied the motion.

¶ 29    Following a sentencing hearing, the trial court imposed 10-year prison terms for each count of predatory criminal sexual assault of a child and 5-year prison terms for each count of criminal sexual assault, for a total sentence of 30 years in prison. Defendant did not file a motion to reconsider sentence.

¶ 30    On appeal, defendant challenges the admission of evidence of his acts of domestic violence in the home. He asserts that this evidence was inadmissible because it was only used to show propensity and was unduly prejudicial. He also argues the error was not harmless beyond a reasonable doubt.

¶ 31    The State responds that the trial court did not abuse its discretion in admitting evidence of domestic violence in the home. The State further contends that the evidence of defendant's guilt was "overwhelming," and the jury would not have reached a different verdict even if the challenged evidence had been excluded at trial.

¶ 32    Generally, evidence of other crimes is inadmissible for the purpose of demonstrating the propensity of a defendant to commit the charged crime. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). However, when evidence of another crime is relevant, that evidence may be introduced for any purpose other than to show the defendant's propensity to commit criminal acts. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). Other crimes evidence is admissible when relevant to establish *modus operandi*, intent, identity, motive, or absence of mistake. *Id.* at 364-65.

¶ 33    Moreover, evidence of other crimes is admissible when it is "part of a continuing narrative of the event giving rise to the offense," is intertwined with the charged event, or explains a part of the offense that would otherwise be implausible. *People v. Outlaw*, 388 Ill. App. 3d 1072, 1086-87 (2009). In other words, evidence of other crimes may be admissible to set the stage for an offense and explain circumstances about it that appeared improbable. *People v. Hale*, 2012 IL App (1st) 103537, ¶ 14  "Where such evidence is part of the course of conduct or a continuing narrative of the charged offense, ordinary principles of relevancy apply and the rules applicable to other-crimes evidence are not implicated." *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 50.

¶ 34    We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 84. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the position adopted by the trial court." *Id.*

¶ 35    Initially, we note that defendant does not challenge the admission of A.E.'s testimony as to other sex offenses committed by defendant, and has therefore waived that issue on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited"). Rather, defendant focuses on K.L.'s, M.W.'s, and Megan D.'s testimony regarding his acts of domestic violence.

¶ 36    Defendant asserts that the domestic violence evidence was not admissible under section 115-7.3 of the Code because the State did not "seek its introduction through [section] 7.3," and "because it was not related to the sexual conduct being charged." See 725 ILCS 5/115-7.3 (West 2020) (when a defendant is charged with, *inter alia*, predatory criminal sexual assault of a child, or criminal sexual assault, evidence of his commission of another such offense "may be admissible," if it is otherwise admissible under the rules of evidence and "may be considered for its bearing on any matter to which it is relevant"). He further argues that this evidence was not admissible pursuant to section 115-7.4 of the Code because he was not charged with domestic violence. See 725 ILCS 5/115-7.4 (West 2020) (when a defendant is charged with, *inter alia*, domestic violence, evidence of the defendant's commission of another offense of domestic violence "is admissible" and "may be considered for its bearing on any matter to which it is relevant"). He concludes that the domestic violence evidence was "only" offered as prejudicial propensity evidence and should therefore have been excluded.

¶ 37    The record reflects that trial counsel repeatedly objected to testimony regarding domestic violence in K.L.'s home. The State responded that evidence of defendant's acts of domestic violence was relevant to explain the length of time it took for K.L. to disclose the sexual abuse and to show defendant's control over K.L. and other family members. The trial court agreed and correctly permitted the testimony on that basis.

¶ 38    The domestic violence committed by defendant against K.L., M.W., and Megan D. is intertwined with the sex offenses committed by defendant against K.L. At trial, K.L. testified that after the initial incident at the hog farm, defendant told her not to tell Megan D. or he would kill her. K.L. also testified that defendant drew a firearm on M.W., hit, choked, and punched K.L. and

other family members, and called her a "b***," a "slut," a "ho," a "c***," and "any cuss word you could possibly think of." Defendant also told K.L. that if she told anyone else about the sexual assaults, he would hurt or kill her. It is clear that defendant's acts of domestic violence, including physical violence against K.L. and other family members, and verbal insults toward her, set the stage for the sexual incidents and explained why K.L. did not immediately disclose defendant's conduct. See *Hale*, 2012 IL App (1st) 103537, ¶ 14 (quoting *People v. McFarland*, 259 Ill. App. 3d 479, 481 (1994) (evidence of other crimes may be admissible when " it 'set[s] the stage' " for the charged offenses and explains otherwise improbable circumstances about them)). The evidence explained why K.L. did not tell anyone about the sexual contact with defendant, *i.e.*, she believed defendant's statements that he would hurt or kill her if she told anyone.

¶ 39    In this case, testimony describing defendant's acts of domestic violence was part of the "continuing narrative" which resulted in the sex offenses charged in this case. See *Outlaw*, 388 Ill. App. 3d at 1086-87. Evidence that defendant struck not only K.L., but her mother and siblings, and prevented Megan D. from leaving with the children, explained why K.L. feared defendant and failed to disclose the sexual assaults sooner. In addition, defendant's acts of domestic violence were "intimately intertwined" with defendant's sexual assaults against K.L. See *Saulsberry*, 2021 IL App (2d) 181027, ¶ 50 ("Where such evidence is part of the course of conduct or a continuing narrative of the charged offense, ordinary principles of relevancy apply and the rules applicable to other-crimes evidence are not implicated.").

¶ 40    Since the domestic violence testimony described events that occurred as part of the continuing narrative of the charged offenses, it was admissible under ordinary principles of relevance. *Id.* Evidence of defendant's acts of domestic violence set the stage for the charged

offenses by establishing defendant's control over K.L. and her family and K.L.'s fear of defendant, and explained why K.L. believed defendant's statements that he would hurt or kill her if she told anyone about the sexual assaults. See *Thompson*, 2020 IL App (1st) 171265, ¶ 84 (a reviewing court will not reverse the trial court's admission of evidence, including other crimes evidence, unless we find that the court abused its discretion).

¶ 41    Even assuming *arguendo* that testimony about defendant's acts of domestic violence was erroneously admitted, any alleged error was harmless.

¶ 42    Our supreme court has established that even if the admission of other crimes evidence was erroneous, to warrant reversal, "the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *People v. Hall*, 194 Ill. 2d 305, 339 (2000). In other words, the evidence must be so prejudicial that it denied the defendant a fair trial. *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 59.

¶ 43    When considering whether an error was harmless, this court "may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 44    Based on our review of the record, the other properly admitted evidence "overwhelmingly supports" defendant's convictions. *Id.* When K.L. was 11 years old, defendant (a man she considered at the time to be her dad and best friend), took her with him to work at the hog farm. While she was taking a shower, defendant came in and started touching her breasts, vagina, and butt. When K.L. told defendant to stop, he "raped" her by placing his penis in her vagina and told

her not to tell her mother or he would kill her. After the hog farm assault, defendant began making K.L. "suck his dick" while he touched her vagina. He also made K.L. lick A.E.'s vagina while he placed his penis in K.L.'s vagina. While A.E. was living with the family, defendant put his penis in her vagina on a daily basis, asked her to suck his penis, and engaged in sexual intercourse with K.L. in A.E.'s presence and vice versa. Considering this evidence, the outcome of defendant's trial would not have been different absent the testimony regarding his acts of domestic violence. See *Hall*, 194 Ill. 2d at 339 (reversal is warranted when the erroneously admitted evidence was a "material factor in the defendant's conviction").

¶ 45    Accordingly, the trial court did not abuse its discretion in admitting testimony regarding defendant's acts of domestic violence.

¶ 46    For the foregoing reasons, the judgment of the circuit court of the Eighth Judicial Circuit, Adams County is affirmed.

¶ 47    Affirmed.