NOTICE
Decision filed 08/01/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220115-U

NO. 5-22-0115

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 19-CF-658 |
| | ) | |
| LAMONT D. DAVIS, | ) | Honorable |
| | ) | Charles C. Hall, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not error in admitting evidence of defendant's other bad acts or in sentencing defendant.

¶ 2    Defendant, Lamont D. Davis, appeals from his convictions and sentences. On appeal, he contends that the trial court erred in admitting prior bad acts evidence, his sentences was excessive and violated the proportionate penalties clause, and the court erred in imposing consecutive sentencing without making the proper findings. For the reasons below, we affirm.

¶ 3                               I. BACKGROUND

¶ 4    The victims, Justin Daubaris and Jaleel Jones, were two brothers who lived together in an apartment building on 936 Hazel Street, Danville, Illinois. On November 10, 2019, three men entered the apartment and shot Jaleel as he escaped his apartment. Justin, who was at another

1

apartment in the same building, went to his apartment when he heard loud noises. Justin was later found deceased due to gunshot wounds and Jaleel survived after medical intervention.

¶ 5 In response to this incident, defendant was charged on November 15, 2019, through information, with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2018)) and one count of home invasion (*id.* § 19-6(a)(3)), armed robbery (*id.* § 18-2(a)(4)), and aggravated battery (*id.* § 12-3.05(e)(1)). A grand jury returned an indictment of the same on November 22, 2019. The State later dismissed the armed robbery count *nolle prosequi*.

¶ 6 On July 30, 2021, the State filed a motion to admit proof of other crimes, wrongs, or acts. Therein, the State requested it be allowed to admit evidence of defendant jumping J.J.P., who was the younger brother of the victims. The State contended that while J.J.P. was not present during the current offenses, he had a history with defendant and his two accomplices, Martez Johnson and Carlos Jones. The State alleged that on October 13, 2019, J.J.P. was walking to a park with his younger niece and nephew when he was approached by the three men and Martez tried to reach into his pocket. During the encounter, J.J.P. was pistol whipped. J.J.P. reported the incident to his mother, the police, and Justin. J.J.P. sent a photo of the three men to Justin prior to November 10, 2019. Subsequently, on October 24, 2019, J.J.P. confronted Martez at school and the two got into a physical altercation which led to both being expelled. It also asserted that the location of the victims' apartment, which was about a block away from J.J.P.'s high school, was well known to the students at the high school. The State argued that the offenses were a continuing narrative of the previous incidents involving J.J.P., as they showed escalating hostility between the involved parties that led to the offenses. It further argued that while the victims in this case were not part of the earlier incidents, the incidents involving J.J.P. provided defendant's motive to choose this location and victims. The State also contended the previous incidents spoke to the identity of

2

defendant being one of the people involved in the offenses. The State argued that absent evidence of these previous altercations, the jury would be left to wonder why defendant and his accomplices went to Jaleel and Justin's apartment that night. The State also argued that the probative value of the prior encounters would not be substantially outweighed by any prejudice to defendant.

¶ 7 The court held a hearing on the State's motion on August 3, 2021. Defense counsel argued there was no evidence of a motive and J.J.P. being able to identify someone from an unrelated incident did not go to identity in the current case. Counsel also contended it was not a continuing narrative, and the evidence is essentially an argument that "because of these things that happened with J.J.P., allegedly, [defendant] has a propensity to be more likely guilty of this new offense," which is not allowed by the law. Counsel asserted the State was not required to prove these people's motive behind going to the victims' apartment that night.

¶ 8 The court granted the State's motion. It noted that it would provide a limiting instruction stating that the evidence was to be considered only for the purpose of showing defendant's motive, identity, and the continuing narrative of events leading to the shootings on November 10, 2019.

¶ 9 The jury trial began October 12, 2021. During the State's opening statement, it noted Justin and Jaleel's brother J.J.P. was 15 years old and went to Danville High School at the time of the offenses. It further noted J.J.P. often visited his brothers' apartment with his friends from high school and would hang out with Justin and Jaleel at the apartment. The State further said that Jaleel initially opened the door for a man because he believed it was likely one of J.J.P.'s friends.

¶ 10 After the defense provided its opening statement, Delores Jones-Daubaris testified that she had three children, Jaleel Jones, Justin Daubaris, and J.J.P. At the time of the offenses, Jaleel was 23 years old, Justin was 20 years old, and J.J.P. was 15 years old. Delores stated she lived at 1004 North Walnut Street, Danville, Illinois, and J.J.P. lived with her. Justin and Jaleel were living

3

together at an apartment on Hazel Street in Danville. She testified that in the late evening of November 10, 2019, her grandchildren and her were upstairs watching a movie until they fell asleep. A big boom on her door woke her up and when she opened the door, Jaleel was on the porch and said, "Mama, I'm shot." Dolores testified she noticed Jaleel's jeans were soaked in blood, so she ran upstairs, got her keys, and helped Jaleel to her car. Dolores then took Jaleel to OSF Sacred Heart Medical Center in Danville. After Delores called Justin 20 to 25 times and he did not answer, she went to Justin and Jaleel's apartment. At some point, Chemika Hemphill answered Justin's phone. When she arrived at the apartment, the police were out front. Dolores waited anywhere from 30 minutes to two hours when a family friend, Chief of Police Chris Yates, arrived at the scene. Chief Yates informed Dolores that the deceased body in the apartment was Justin.

¶ 11 Dolores testified she then went back to the hospital and, when she arrived, Jaleel was being put in the ambulance to be transported to Carle Hospital in Champaign for surgery to remove the bullet from his pelvis. She was able to talk to Jaleel at that time, and told Jaleel that Justin was deceased.

¶ 12 Jaleel testified that on November 10, 2019, he was living with his brother Justin at 936 North Hazel Street, Apartment A. At the time of the offense, they had been living there for a couple of months. Jaleel testified that his little brother J.J.P. was attending Danville High School, which was a block away from his apartment. J.J.P. would visit them after school, along with J.J.P.'s friends. Jaleel stated that in November 2019, he and his brother Justin were selling marijuana out of the apartment all day and all night. The majority of the people he sold to were people that he knew smoked marijuana. He also stated that J.J.P.'s friends would buy marijuana.

4

¶ 13    Jaleel explained the layout of his apartment. He stated that the living room was right inside the front door of the apartment. A hallway to the kitchen ran on the right side of the living room. To the right of the kitchen, there was a back room, which had a back door that led to the alley behind the apartment building. Jaleel testified the kitchen was visible from the front door, but the back door was not visible from the front door.

¶ 14    Jaleel testified on the evening of November 10, 2019, that he went to his apartment from his girlfriend's house but was unable to get into his apartment because the door was locked and he lost his key. He called his brother Justin who was at Chemika's apartment, which was Apartment D located in the back of their apartment building. Justin came and let Jaleel into their apartment, then went back to Chemika's apartment. Jaleel testified he was in the living room and a little after 11 p.m., he heard someone knock at his front door. Jaleel turned on the porch light and looked out the window at the top of the door. Jaleel saw one male who looked like one of the kids that his brother J.J.P. brought to his apartment, but Jaleel did not recognize him. Jaleel then opened the door, and the male asked if Jaleel had marijuana. Jaleel testified the male did not look like a threat, so he let the male inside. Jaleel informed the male of the cost of the marijuana and the male said, "I got to go see what my bros and them want." Jaleel looked at the door and observed two additional males standing in the doorway that he did not notice earlier. He was nervous and went to the door. Jaleel could not remember if the male in his apartment or the men outside of the apartment opened the door, but he stated that the door opened and a gun was in his face. Jaleel grabbed the gun and moved it out of his face. The male in his apartment then put the gun to the back of his head and told Jaleel to get down. At that time, Jaleel noticed the third male also had a gun. Jaleel put his hands in the air, sort of shrank down, and backed away from the front door. He then heard someone say, "Just pop his a**," and he ran down the hallway of his apartment. As he

5

was running, Jaleel heard a gunshot. He kept running and made it into the kitchen where he turned right and went to the back door. The back door was locked, and his hands were shaking, so he could not open the door at first. He then heard footsteps getting closer and then another gunshot, which hit his hip. Jaleel testified he was able to get the back door open, and he ran down the alley to his mother's house on Walnut Street, which was about two blocks away.

¶ 15    Jaleel stated the male holding the gun in his face was approximately 6'3" or 6'4." Jaleel estimated the male was about a head shorter than him. Jaleel identified defendant as the person who put the gun in his face when he opened the door. Jaleel testified defendant had dreadlocks on November 10, 2019, and at trial, defendant had cut them off. Jaleel stated once he pushed the gun to the side there was nothing obstructing his view of defendant's face, the lighting conditions were bright due to the front porch light, and he was less than a foot away from the defendant.

¶ 16    When Jaleel arrived at his mother's house, he banged on the door and a window. His legs gave out and he was sitting on the front stairs when his mother and uncle came to the door and Jaleel told them he was shot. His mother became frantic and drove him to the hospital. The hospital in Danville transferred Jaleel to Champaign. Before he was transferred, his mother informed him that his brother Justin had been killed. At Carle Hospital in Champaign, the bullet from his pelvis was removed and he suffered a fractured pelvis bone.

¶ 17    Jaleel testified that officers interviewed him while he was at the hospital in Danville and again at Carle Hospital in Champaign. The first interview occurred in the Danville emergency room while he was receiving medical treatment. Jaleel could not remember if the interview was long or short. He testified that he did not say much and was worried about his brother Justin.

¶ 18    Jaleel stated that the police interviewed him at Carle Hospital a couple times. At the time, he did not know the name of defendant or the other two assailants but described defendant as a

6

dark-skinned male, who was around 19 to 20 years old and 5'9" or 5'10" in height, with dreadlocks. Jaleel also told the officers that defendant had on a blue bubble jacket and a hoodie. Jaleel informed officers that the first male to enter his apartment was also about 5'9" or 5'10" and wearing a black bubble jacket, black hoodie, and a black beanie. Jaleel did not get a good look at the third male.

¶ 19    After the first interview, while still at Carle Hospital, the mother of Jaleel's child showed him a Facebook Live video. In the video, Jaleel recognized defendant as the person who put a gun in his face. Jaleel informed the police of the video, and they returned on November 12, 2019, for another interview. The police showed Jaleel the same video as his child's mother did, and he again recognized defendant as the person he struggled with over the gun.

¶ 20    On cross-examination, Jaleel agreed that he sold marijuana to strangers sometimes. He stated that he kept his marijuana and money in a plastic drawer near the front door. He agreed that anyone who bought marijuana from him would see him get the marijuana out. Jaleel disagreed that he told officers at the Danville hospital that he saw three armed men when he first opened the door. Jaleel agreed that he told the officer that he thought the men were there to rob him but never specified what he thought they were going to rob. He also agreed he told officers that none of the men were wearing gloves.

¶ 21    Chemika Hemphill testified that on November 10, 2019, she lived at 936 Hazel Street Apartment D, Danville, Illinois, and Justin came over around 9 or 10 p.m. A little after 11 p.m., she and Justin were lying on her bed watching a movie and she heard a little bit of arguing. They did not pay attention to the arguing because her neighbors usually fought. Later, she heard a thud. Chemika testified that Justin heard a noise that she did not hear and Justin jumped out of her bed. She went to the bathroom and while she was in the bathroom, she heard a noise that she initially

7

thought were pots and pans. As time elapsed and Justin did not return, Chemika started to believe the sound was gunshots. She noticed Justin's phone ringing and it was his mother, so she answered the phone. When she walked out of her apartment, she saw the ambulance, the police, and eventually, Justin's mother. Chemika stated she put two and two together that Justin had been killed but no one explicitly told her. She gave Justin's belongings to his family. Chemika could not remember how much time elapsed from when Justin left her apartment to when she heard the sounds, but stated it happened fast, probably a minute or two.

¶ 22 Prior to J.J.P.'s testimony, defense counsel indicated he wanted to preserve the record and maintain his objection against J.J.P.'s testimony as improper other-crimes evidence. J.J.P. testified that he was the brother of Justin and Jaleel. His high school was a block away from his brothers' apartment, and he would visit his brothers every day or every other day and brought people along with him. Jaleel agreed that people from his school knew where his brothers lived and knew he was over there a lot.

¶ 23 J.J.P. testified that on October 13, 2019, he was on fall break from school and decided to take his niece and nephew to the park. He stated they did not make it to the park because Martez and two other people approached J.J.P. J.J.P. knew Martez because they went to school together. J.J.P. knew one of the other men as 'Los, which was a nickname. He did not know the third man. J.J.P. testified that Martez tried to reach into J.J.P.'s pocket, but J.J.P. stopped him. Afterwards, the three men jumped J.J.P. The men had guns and used the guns to swing at J.J.P. J.J.P. stated he did not fight back, and the incident ended when the men walked away. J.J.P. then took his niece and nephew back home. When he got home J.J.P. told his mother about the incident and his mother called the police. Later that day, Justin asked J.J.P. about the guys who jumped him via Facebook Messenger. J.J.P. sent Justin a picture of the men that he obtained from Martez's Facebook. J.J.P.

8

identified the State's exhibit Nos. 7A through C as the pictures of the three men who jumped him. J.J.P. testified the State's exhibit No. 7A was a picture of Martez, exhibit No. 7B was a picture of 'Los, and exhibit No. 7C was a picture of the third male whom J.J.P. did not know. J.J.P. testified the male in State's exhibit No. 7C had dreads.

¶ 24    J.J.P. admitted he was upset about getting jumped at the park and wanted to "return the favor." On October 24, 2019, after he returned to school from fall break, he got into a fight with Martez. As a result, he and Martez were punished and J.J.P. was expelled. J.J.P. confirmed he was not at his brothers' apartment on the night of November 10, 2019.

¶ 25    On cross-examination, J.J.P. stated once he found the pictures of the men who jumped him on Facebook, he was aware of who jumped him. J.J.P. did not remember speaking with Officer McFarland at Danville High School on October 21, 2019, and telling him that one of the people who jumped J.J.P. was Carlos Jones. J.J.P. stated he named defendant as one of the people who jumped him after he was told that defendant was a suspect in his brother's murder.

¶ 26    On redirect examination, J.J.P. stated that 'Los and Carlos Jones were the same person. He also testified that defendant was the third person that jumped him at the park.

¶ 27    Officer Joseph Moulton of the Danville Police Department testified that on November 10, 2019, he was dispatched to 936 North Hazel Street in relation to the shooting of Jaleel Jones. When he arrived at the scene, Officer Shelton, Officer Harold, and Officer Phillips were present. Officer Moulton stated they entered through the back door of the apartment. The apartment was messy, but it was clear some sort of altercation took place. There were miscellaneous items thrown on the ground and it appeared that someone had rummaged through the kitchen drawers. They located a victim, who appeared to be unresponsive and deceased, in the bedroom off of the hallway. He checked for a pulse and did not find one. There was a large pool of blood underneath the victim's

9

torso on the air mattress that he was draped over. No one else was located inside the apartment. Officer Moulton stated that a firefighter EMT located a wallet in the bedroom and gave it to him. He located an ID in the wallet and stated the photo on the ID did not look like the same person who was in the bedroom. He then asked the firefighter EMT where they had located the wallet and he placed the wallet back by the closet in the bedroom where it was originally found. Officer Moulton identified the State's exhibit No. 8(1) as a picture of the wallet that was handed to him. On cross-examination, Officer Moulton testified that he was not wearing gloves when he touched the wallet.

¶ 28 Officer Travis Spain of the Danville Police Department testified that he was assigned to the United States Marshals Fugitive Task force in November 2019. The task force specialized in high-risk fugitive apprehensions. Officer Spain stated that if something needed to be addressed while he was in Danville, he also still had the duties of a police officer. He testified that on November 13, 2019, he was working in the capacity of the marshal service at that time and was in the area of Fair Oaks housing complex. While on patrol, he observed Carlos Jones and defendant walking in that area. He knew both men were barred from the Fair Oaks property and took them into custody for criminal trespass. Officer Spain stated he was aware that defendant was a person of interest in a homicide that occurred in Danville. Following his arrest, defendant was transported to the Danville Police Department criminal investigations division.

¶ 29 Detective Patrick Carley of the Danville Police Department testified that he was the lead detective for the homicide that occurred at 936 Hazel Street, Apartment A on November 10, 2019. He went to Carle Hospital with Detective Jon Stonewall at approximately 1:58 a.m. on November 11, 2019, to meet with Jaleel in the emergency room, where he was being attended to by medical staff. Detective Carley stated Jaleel was coherent and able to speak, so he conducted an initial

10

interview. He was unable to finish the interview because the nurses and doctors wanted the officers to leave so they could treat Jaleel. Before he left, he gave his name and telephone number to Jaleel and advised Jaleel to contact him if he thought of anything further. Detective Carley testified that Jaleel did not know the names of the individuals who were involved in the crime. Detective Carley then spoke with Jaleel's family members who were standing in the ER lobby and asked them if they knew what happened or why it happened. He also told the family members to contact him if they thought of anything further.

¶ 30    Detective Carley testified that he later received a text and after reading the text, he watched a video posted to Martez Johnson's Facebook page. Detective Carley stated the video was 13 minutes long with approximately 10 subjects in the video. After speaking with Jaleel, Detective Carley downloaded the video from Martez's Facebook account.

¶ 31    Detective Carley testified that on November 12, 2019, he and Detective Stonewall returned to Carle Hospital and conducted a more thorough, detailed interview with Jaleel. The interview was audio- and video-recorded. Detective Carley testified he was not able to ask Jaleel to describe the assailants during his initial interview. In this interview, however, Jaleel was able to describe the individual with whom Jaleel struggled and fought over the gun. Jaleel stated that the individual was 6 foot tall, in his early 20s, and wore a blue bubble jacket, had a dark complexion, and his braids stuck out of his hoodie. Detective Carley also showed Jaleel a Facebook video that he found and asked Jaleel if it was the same one that Jaleel previously watched. About 16 to 18 seconds into the video, Jaleel pointed to a male on the right side of the screen who was wearing a blue Bears shirt with dreadlocks and stated he was the male with whom he struggled over the gun. Detective Carley testified that defendant was the individual that Jaleel identified as the offender. Detective Carley also asked Jaleel if he recognized anyone else in the video, and Jaleel said he did not know.

11

Detective Carley identified the State's exhibit No. 3 as a screenshot picture of the Facebook video he showed Jaleel. He stated the picture showed a black male wearing a blue coat and a black ball cap and another black male with dreadlocks wearing a blue shirt, which was defendant. Detective Carley said the other individual in the baseball cap was Carlos Jones. Detective Carley stated Carlos Jones was in the majority of the video. Detective Carley knew Martez and testified that Martez was also in the video. He further testified that Jaleel did not identify either Carlos Jones or Martez Johnson from the Facebook video.

¶ 32    Detective Carley testified that Jaleel also showed him a screenshot image that was on Jaleel's phone, which displayed Martez Johnson, defendant, and Carlos Jones. Jaleel stated the picture was texted to him, but he did not remember who sent him the image. Detective Carley identified the State's exhibit No. 38 as the screenshot image that Jaleel showed him. Detective Carley stated he asked if the person he identified from the Facebook video was in the picture, and Jaleel pointed at defendant, who was in the middle wearing a black jacket, red hoodie, and white shoes. Detective Carley also said Martez Johnson was on the left of the picture and Carlos Jones was on the right. Detective Carley asked Jaleel if the other two males in the photo were involved in the shooting. Jaleel pointed to Carlos Jones and said that he was also there, but he was not sure if Carlos was in the Facebook video. Jaleel told Detective Carley that he did not know if Martez Johnson was there. Jaleel also told Detective Carley that he watched the Facebook video before he was sent the screenshot image.

¶ 33    Detective Carley testified that on November 13, 2019, he interviewed defendant at the police station. At that time, defendant was 18 years old, 6 foot tall, and 190 pounds. Defendant also had braids or dreadlocks and was wearing a black zip up hooded sweatshirt, puffy blue Tommy Hilfiger winter jacket, and a pair of jeans. The interview was audio- and video-recorded.

12

Detective Stonewall was also present. Defendant stated that he spent the night in Chicago with his grandmother, Rochelle Butler, on November 9, 2019, and got back to Danville around one or two in the morning on November 11, 2019. After defendant provided this alibi, Detective Carley had other detectives confirm defendant's alibi with his grandmother. Detectives Phil Wilson and TJ Davis brought defendant's grandmother in for an interview, which was audio- and video-recorded.

¶ 34 On cross-examination, Detective Carley stated that defendant understood his *Miranda* rights, including that he could stop talking at any point, and defendant chose to speak with him. He testified that he continued the interview with defendant after the other detectives spoke with Rochelle. He spoke with defendant about Rochelle's conversation. At that point, defendant told Detective Carley that he had been mistaken and he was not in a car at the time of the shooting. Detective Carley agreed that defendant could have chosen not to talk once the interview resumed. Detective Carley testified that he was aware that on November 13, 2019, Officer Spain also arrested Carlos Jones. He agreed at that point, Jaleel also identified Carlos Jones as the individual who first entered his apartment. Detective Carley stated they did not speak with Carlos Jones on November 13, 2019, but tried to speak with him on November 26, 2019, and Carlos did not want to speak. Detective Carley testified that to his knowledge, Carlos Jones had not been charged with homicide.

¶ 35 Rochelle Butler, defendant's grandmother, testified that in November 2019, she lived in Danville, Illinois. She stated she remembered talking to police about her trip to Chicago. She went to Chicago to shop with defendant, her husband, her niece, and her daughter. She did not remember when her trip occurred. Rochelle then testified that she remembered that she came back to Danville on Sunday, November 10, 2019. She did not remember the exact time she returned but said it was in the evening. She was trying to get back to Danville before it got dark, but they were running

13

behind, so she did not get back before dark. She stated that everyone that went with her to Chicago also came back with her to Danville, and she was back in Danville before 11 p.m.

¶ 36    Rochelle testified that she reviewed her video-recorded interview to prepare her testimony. The State asked if she told the police that she arrived back to Danville on Sunday night between 6 and 6:30 p.m. Butler testified, "I'm not sure. I mean, if I told them that during that time, that's what happened, but this was two years ago, and I don't remember as of now what I told them."

¶ 37    Phillip Wilson testified that he was a detective for the Danville Police Department on November 10, 2019, but was now retired. He responded to the crime scene at 936 Hazel Street. At 2:30 a.m. on November 11, 2019, he obtained a search warrant for the crime scene. Detective Wilson testified that Brandi Field, a crime scene investigator for the Illinois State Police Crime Scene Unit conducted the search and collection of evidence.

¶ 38    Detective Wilson and his partners conducted a neighborhood canvass but did not find anything of significance to the investigation. Detective Wilson found two cameras that could have had a vantage point of the crime; one at the Survivor Resource Center and one at the Royal Donut. Nothing relevant was recorded at Royal Donut because the camera was motion-activated. Two cameras at the resource center captured relevant footage. Detective Wilson reviewed the surveillance footage and an enhanced video that came from that footage. The parties stipulated that Steven Strahm, a computer evidence recovery technician with the Office of the Illinois Attorney General High Tech Crimes Bureau, enlarged the area and cleared up the image, causing the video to brighten up.

¶ 39    Detective Wilson identified State's exhibit No. 12 as the enhanced video from the camera capturing the south side of Hazel Street. At the time stamp of 11:10 p.m., three subjects crossed in front of a lighted window or door at Apartment C or D and approached Apartment A. After a few

seconds, a light illuminated outside the front of the apartment and at least one of the subjects went into the apartment. Wilson stated the video did not show the subjects' faces or clothing.

¶ 40    Detective Wilson identified State's exhibit No. 13 as the footage from another camera at the resource center—which captured the vacant lot behind the apartment. The video showed a subject running southbound on Vermilion toward Walnut Street at about 11:11 p.m. Detective Wilson agreed that the subject ran in the general area of the house of Jaleel and Justin's mother.

¶ 41    Detective Wilson testified that on November 13, 2019, he and Detective Davis went to Rochelle's home to speak with her. After Rochelle initially spoke to Detective Davis, she went to the Public Safety Building to provide an audio-video recording of her statement. Detective Wilson testified that Rochelle told him that she arrived back to Danville from Chicago between 6 and 6:30 p.m. on November 10, 2019.

¶ 42    Brandi Field, a crime scene investigator for the Illinois State Police, testified that on November 10, 2019, she was dispatched to 936 North Hazel Street, Apartment A, Danville, Illinois, to investigate a home invasion and homicide. Investigator Field then identified all the photographs she took and diagrams she made that night.

¶ 43    Investigator Field testified that there was a plastic container with drawers in the living room. The drawers contained $440 in cash and over 28 grams of marijuana. A little over three grams of marijuana was also found on the floor of the living room. In the kitchen, some drawers were opened, and she swabbed them for DNA. In the bedroom, the television screen was faced down and had holes in it. Initially, Investigator Fields thought a projectile was in the television but upon putting it upright, there was another defect in the bottom of it that lined up with a defect in the wall behind it. The hole in the wall was a through-and-through hole into the kitchen. Investigator Fields concluded that bullet went into the kitchen.

15

¶ 44    She found two bullet casings in the bedroom, a casing in the hallway, and a casing in the kitchen. She identified State's exhibit Nos. 19 and 21 as the .45-caliber and .40-caliber casings found in the bedroom, respectively, State's exhibit No. 20 as the .45-caliber casing found in the kitchen, and State's exhibit No. 18 as the .45-caliber casing found in the hallway. She also found two projectiles in the kitchen. Investigator Fields identified State's exhibit Nos. 22 and 23 as the .45-caliber projectiles recovered from the kitchen.

¶ 45    Investigator Fields identified State's exhibit Nos. 28 and 29 as the casings she received from the victims' family on November 21, 2019. They told her they discovered the casings in the bedroom when they were cleaning out personal effects. State's exhibit No. 28 was a .40-caliber casing and exhibit No. 28 was a .45-caliber casing. She also identified State's exhibit Nos. 24, 25, and 26 as the projectiles recovered from Justin's body. Investigator Fields testified that she sent the casings and projectiles to the Illinois State Police forensic lab for further testing.

¶ 46    Carolyn Kersting, a retired Illinois State Police Forensic Evidence Technician, testified as to her qualifications. The court accepted her as an expert in firearms identification. She testified she was first assigned to this investigation in March 2020. Kersting testified that in examining the casings for this case, there were two .40-caliber Smith & Wesson casings and four .45 automatic casings. Kersting testified that matching casings to bullets was very difficult and had rarely been successful. Kersting opined that all four of the .45 automatic fired casings were fired by the same firearm and both .40-caliber Smith & Wesson casings were fired from the same firearm. Based on her examination of the casings and projectiles found in the house and Justin's body, Kersting opined there were three—possibly four—guns used.

¶ 47    Kathryn Doolin, an Illinois State Police Forensic Scientist, testified to her qualifications. The court then accepted her as an expert in the field of firearm identification. She stated she

16

conducted an additional examination of the firearm evidence in this case after Kersting retired in December 2020. Doolin testified that she compared the fired bullet recovered from Jaleel's body to the firearm evidence already examined by Kersting. Doolin identified State's exhibit No. 27 as the fired bullet recovered from Jaleel's body. Doolin stated the bullet was of .45 caliber. Based on her examination, Doolin opined that the fired bullet recovered from Jaleel came from the same gun as two of the fired bullets recovered from Justin's body.

¶ 48    The parties then stipulated that Katharine Mayland, an Illinois State Police Forensic Scientist, would testify that the fingerprints found on plastic food saver bags in the kitchen matched Justin's fingerprints, the fingerprints obtained from the wallet in the bedroom matched Justin's father's fingerprints, and the fingerprint retrieved from the Blue Cross-Blue Shield insurance card in said wallet matched Danville Police Officer Moulton's fingerprints. The parties also stipulated that the sample swabs taken from the doorknobs inside the house and from the back and front door produced inconclusive profiles, except one sample from the kitchen handle included Justin and Jaleel's DNA.

¶ 49    Doctor Scott Denton, the coroner's forensic pathologist, testified to his qualifications. The court then accepted him as an expert in the field of forensic pathology. Dr. Denton performed the autopsy of Justin on November 11, 2019. He noted three gunshot wounds, one on the left midline side of Justin's back, one on the right upper back of his shoulder, and another on the left upper back just above the shoulder blade. Dr. Denton testified that the wound on the left side of Justin was an entrance wound. The wound had soot around it and gunpowder stippling, which indicated the gun was shot at close range, meaning the muzzle of the gun was closer than 18 to 24 inches of the point where the bullet struck the skin. He opined the muzzle of the gun was a few to several

17

inches away from the skin. The path of the bullet went left to right, straight across his abdomen, which involved his back muscle, left kidney, spleen, ribs, and lodged in his first lumbar vertebrae.

¶ 50    Dr. Denton testified that the wound on the upper right back was an entrance wound and there was no evidence the bullet was fired close-range. He clarified that as such, the gun was farther than 18 to 24 inches away from Justin, but he could not determine how much farther. He stated the bullet from this wound traveled right to left, downward, and forward. It went through the back of the chest cavity through the third rib, into the right lung, through the top and bottom part of the heart, and fractured the left chest cavity and surface. There was a bruise on Justin's skin and the bullet was recovered just beneath the bruise. Dr. Denton stated the injury to the heart would have caused the heart to stop beating. Based on his examination, the muzzle of the gun would have been behind, above, and to the right of Justin's body.

¶ 51    Dr. Denton testified the third wound on the left upper back was another entrance wound and there was no evidence of close-range firing. He again stated this meant the muzzle was more than 18 to 24 inches away from Justin. The bullet from this wound traveled back to front and slightly downward. It struck the scapula which fragmented that bone and the bullet fragmented into two large pieces. The bullet continued to travel just beneath the collar bone and stopped in the soft tissue. Based on his examination, the muzzle of the gun was behind, above, and toward the left of Justin. Dr. Denton also observed two small scrapes on the top of Justin's foot and toe, which Dr. Denton believed were incidental. There were also scrapes on Justin's right thumb, back of his index finger, and back of his left fifth finger. Dr. Denton testified the scrapes were consistent with his hand or finger striking something or something striking his fingers and hand. The State rested.

¶ 52    The defense motioned for a directed verdict and the court denied the motion. Defendant decided not to testify, and the defense presented no evidence. The jury found defendant guilty of

18

first degree murder, home invasion, aggravated battery, and that defendant possessed a firearm during those offenses.

¶ 53 On October 18, 2021, defense counsel filed a motion for a new trial. The motion argued, *inter alia*, that the court erred in granting the State's motion to admit proof of J.J.P. getting jumped and fighting with Martez at school. After hearing arguments from both parties, the court denied the motion for a new trial.

¶ 54 A presentence investigation report (PSI) was filed on November 23, 2021. The PSI report revealed that defendant had four juvenile offenses: (1) possession of stolen property (Vermilion County case No. 15-JD-142); (2) possession of a controlled substance (Vermilion County case No. 16-JD-25); (3) aggravated discharge of a firearm (Vermilion County case No. 16-JD-233); and (4) aggravated discharge of a firearm (Vermilion County case No. 17-JD-80). Defendant also had one previous adult conviction for possession of a firearm without a Firearm Owners Identification Card (FOID card). The PSI indicated that defendant suffered from bipolar disorder, anxiety, and attention-deficit/hyperactivity disorder (ADHD). Defendant previously took Remeron for his bipolar disorder and Adderall for his ADHD but stopped taking the medications in 2018. Defendant reported that he went to Pavilion Behavioral Center in Champaign, Illinois, in 2011-12, for his mental health. He stated he went to Harsha Behavior in Terre Haute, Indiana, in 2011-12 for his mental health, but the record department had no records of defendant's attendance. Defendant reported that he began drinking alcohol at the age of 16 and drank a fifth of liquor every other day. He first tried marijuana at 11 or 12 years old and smoked a lot every day. He started using MDMA (ecstasy) every day, two times a day since he was 17 years old and took MDMA on the day he got arrested. Defendant advised that he felt like he did not have a problem with alcohol

19

but believed he had a problem with drug abuse and considered doing any treatment or counseling recommended.

¶ 55    The PSI report stated that defendant attended Gateway Foundation in Carbondale and Springfield in 2016. Verification from Gateway Foundation in Carbondale showed that defendant attended treatment around January 2016 to June 2016 for substance abuse treatment, but treatment was terminated due to defendant demonstrating physical aggression toward another client. Defendant also reported attending Chestnut Health Systems in Bloomington, Illinois, in 2016. Verification from Chestnut Health Systems showed that defendant was admitted to residential treatment on May 3, 2016, and treatment appeared to be going well, but defendant was discharged on May 11, 2016, after getting into a physical altercation with another patient. The PSI report stated defendant was at a high risk to reoffend. Defendant's drug treatment records from Gateway and Chestnut were attached to the PSI report. An addendum to the PSI was filed on November 24, 2021, and provided additional records from The Pavilion Foundation regarding defendant's mental health treatment from 2011 to 2014.

¶ 56    The sentencing hearing took place on February 14, 2022. At the outset, the State indicated that all the first degree murder counts would merge but the home invasion and aggravated battery with a firearm counts would not merge and would be served consecutively pursuant to law. The court asked defense counsel if he agreed, and defense counsel stated, "yes, your honor." The State averred the first degree murder conviction had a sentencing range of 35 to 75 years' imprisonment, based on the 15-year firearm enhancement, to be served at 100%. The home invasion conviction was a Class X felony, with a 21 to 45 years' imprisonment sentencing range, based on the 15-year firearm enhancement. The State said that truth in sentencing dictated the sentence for the home invasion conviction would be served at 85% if the court found there was great bodily harm. The

State asserted it would request the court to make such finding based on the evidence that a bullet entered Jaleel's left hip, fractured his pelvis, lodged in his groin, and surgery was required to remove the bullet from Jaleel's body.

¶ 57 The State further said the sentence for the home invasion conviction would be mandatory consecutive to the sentence for the first degree murder conviction if the court found severe bodily injury. The State argued the same evidence it argued was sufficient to find great bodily harm would also be sufficient to find severe bodily injury. It also stated the aggravated battery with a firearm conviction was a Class X felony, with a 6 to 30 years' imprisonment sentencing range to be served at 85%. The State again said the aggravated battery with a firearm sentence was mandatory consecutive in the same way the home invasion sentence would be, asking the court to make a finding of severe bodily injury to Jaleel. Defense counsel stated he agreed with the State's recitation of the possible penalties. The State averred defendant was subject to a minimum of 62 years' imprisonment to 120 years in total.

¶ 58 The court asked if it was the State's position that the home invasion and aggravated battery with a firearm sentences were mandatory consecutive to the first degree murder sentence if the required finding was made. The State said that all counts were consecutive to each other pursuant to section 5-8-4(d)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(1) (West 2018)), which provided mandatory consecutive sentences if one of the offenses was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury. Defense counsel again agreed with the State's explanation of the consecutive mandate. The State noted that because defendant was 18 years old at the time of the offenses, he was eligible to petition for early parole after serving 20 years or more of his sentence, pursuant to section 5-4.5-115 of the Unified Code

21

of Corrections (730 ILCS 5/5-4.5-115 (West 2020)). The court noted it received and reviewed the PSI report and addendum. Both parties stated there were no additions or corrections.

¶ 59    The State called the victims' mother Dolores Jones-Daubaris, who read her victim impact statement to the court. The State also moved to admit and read a victim impact statement from Jaleel. The State admitted a certified statement of a conviction for case No. 2019-CF-213 for possession of a firearm without a FOID card. The State rested and defense counsel presented no evidence.

¶ 60    The State argued defendant was not a getaway driver or a lookout, but an active participant as a shooter in these offenses. It stated defendant was armed and forced his way inside with a gun pointed at Jaleel's face. The State said the cowardly acts from defendant and his friends, who were all armed, shot Jaleel as he was running away then executed Justin by firing bullets into his back. The State noted defendant had a criminal history, including a juvenile delinquency for aggravated discharge of a firearm and an adult conviction for possession of a firearm without a FOID card. It stated defendant's criminal history began when he was 15 years old and was arrested for aggravated discharge of a firearm. The State argued the possession of a firearm without a FOID card—where defendant was arrested with a Ruger. 357 revolver and was released on October 11, 2019—was still pending when he committed these crimes. The State argued that defendant showed no remorse, no responsibility, and no sympathy, and acted with disregard for human life. It contended this was not a sudden change in behavior for defendant and the PSI report showed that even when defendant was 10 years old he had no remorse for his behaviors and took no responsibility, where he stated at The Pavilion Foundation, "I'll probably go to jail one day. Who cares?" and "If someone hits me, I will shoot them. I have my own gun." The State requested the court impose a 100-year sentence of imprisonment.

22

¶ 61 Defense counsel stated that because defendant maintained his innocence and planned to appeal the jury's verdicts, he decided not to make a statement. Defense counsel contended that he and the State had a difference of opinion regarding defendant's statements at 10 years old. Defense counsel asked, "could you imagine being 10 years old and feeling that way?" Defense counsel argued that he did not believe a 10-year-old having those sorts of feelings should be blamed for those feelings. He stated it was clear from a young age that defendant had drug issues, noting defendant had been in drug treatment and also mental health treatment. Defense counsel noted the treatment was not necessarily successful but he believed it was mitigating that defendant participated in treatment for a large portion of his life. He stated he believed it showed there were significant problems that defendant was trying to make better. Defense counsel acknowledged nothing would fix what happened to the family of Jaleel and Justin and that it was a tragedy.

¶ 62 Defense counsel requested 35 years' imprisonment on the first degree murder conviction, 21 years' imprisonment on the home invasion count, and 6 years' imprisonment for the aggravated battery with a firearm. Defense counsel further stated if defendant had been a few months younger and under the age of 18, there would have been other factors the court would have been required to consider. He acknowledged that since defendant was over the age of 18, the court was not required to consider those factors but the court was also not prohibited from considering them. Defense counsel stated, "the idea that somebody who turns 18 is somehow magically more mature than somebody who is 17 and 360 days old is clearly ridiculous, but a line has to be drawn." He stated an average 18-year-old would have a certain level of maturity, understanding, and responsibility. He argued, however, it would be unfair to conclude that defendant was an average 18-year-old based on all the issues that arose in his life. Defense counsel noted that some of it was

23

defendant's fault but not all of it. As such, defense counsel believed the minimum sentences were appropriate.

¶ 63 The court stated that looking at the possible mitigating factors, defendant completed his GED in 2018, admitted a substance abuse problem, and was willing to engage in any treatment or counseling that would help. The court stated factors in aggravation were that defendant had five juvenile cases, the last two dealing with firearms, and one adult conviction for possession of a firearm without a FOID card. The court noted defendant had an affinity for firearms and there had been opportunities to amend his ways regarding firearms but that did not occur. The court stated the current offense was a horrific, ruthless, cold-blooded, execution-style murder. It stated the details and facts argued by the State were supported by the record. The court said the family of the victims and the community simply could not tolerate this behavior or treachery. It noted the PSI report indicated that defendant was at a high risk to reoffend and laid out in detail prior opportunities for defendant to help himself, but each opportunity ended up in aggression or violent behavior. The court stated that defendant's wanton, cruel, and horrific violence in this case required a substantial sentence.

¶ 64 The court then stated that it had been requested to make a finding that there was great bodily harm to Jaleel. The court stated the record was very thorough on the injuries endured by Jaleel, in that he had to have surgery on his left hip, a bullet lodged in his groin that had to be removed, and a fractured pelvis. The court found that Jaleel did suffer great bodily harm. The court then stated:

> "Concerning [the aggravated battery count], the court makes a finding on the aggravated battery with a firearm that based upon the same evidence, in the entirety of the record, the court makes an express finding that Jaleel Jones suffered severe bodily harm."

24

¶ 65    The court imposed a 65-year imprisonment sentence for the first degree murder, 21 years' imprisonment for home invasion, and 20 years' imprisonment for aggravated battery with a firearm. The court noted that based upon defendant's age, he was able to petition for parole after serving 20 years. Defendant appealed.

¶ 66                                II. ANALYSIS

¶ 67    On appeal, defendant raises three issues, alleging; (1) the court erred in allowing other bad acts evidence through J.J.P.'s testimony, (2) the court erred in sentencing defendant to a *de facto* life sentence, and (3) defendant's consecutive sentences violated his due process rights. We address each in turn.

¶ 68                           A. Other Bad Acts Evidence

¶ 69    Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity ***." "The rationale for this rule is not that a defendant's bad character, as evinced by other bad acts, is irrelevant when he is charged with a crime." *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). Rather, the prejudice and confusion created by the other bad acts outweighs the probative value. *Id.*

¶ 70    Such evidence, however, may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Other crimes and bad acts can also be admitted "if it is part of the 'continuing narrative' of the charged crime." *People v. Pikes*, 2013 IL 115171, ¶ 20.

¶ 71    We review the trial court's admission of the other-crimes evidence under the abuse of discretion standard. *People v. Peterson*, 2017 IL 120331, ¶ 125. This is a deferential standard of review, and we will not reverse such decision unless it is " 'arbitrary, fanciful, or unreasonable to

25

the degree that no reasonable person would agree with it.' " *Id.* (quoting *People v. McDonald*, 2016 IL 118882, ¶ 32). Reasonable minds could differ about the admissibility of the evidence without requiring reversal. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003).

¶ 72     With respect to the other bad acts evidence, the State contends such evidence was not presented to show defendant's propensity to commit bad acts but rather was presented for the purposes of identity, motive, and a continuing narrative. We agree J.J.P.'s testimony was admissible for a purpose other than propensity evidence.

¶ 73     "Although the State is not required to prove motive, it is certainly entitled to do so when evidence of motive exists." (Internal quotation marks omitted.) *People v. Johnson*, 368 Ill. App. 3d 1146, 1157 (2006). "[T]he motive exception to the general ban on other-crimes evidence arises in the context of other crimes that serve as the motive behind the crime charged." *People v. Lenley*, 345 Ill. App. 3d 399, 407 (2003). Moreover, "[o]ther-crimes evidence is admissible if it is part of a continuing narrative of the event giving rise to the offense, intertwined with the charged offense, or explains an aspect of the charge which would otherwise be implausible or inexplicable." *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58.

¶ 74     Defendant contends that motive, identity, and continuing narrative cannot be shown where J.J.P. was not at his brother's house the night of the shootings and J.J.P.'s brothers were not present during the park or school incident. Moreover, the park incident occurred over a month before the shooting and the school incident occurred about two weeks before the shooting. He further argues that there was no evidence that defendant, Martez, or Carlos was upset or looking to retaliate. There was also no evidence that the men knew the victims in this case were related to J.J.P.

¶ 75     Defendant's arguments overlook that explicit testimony of motive is not necessary; the motive must only be fairly inferable from the evidence (*People v. Wallace*, 114 Ill. App. 3d 242,

26

249 (1983)) or tend to establish the motive theory (*People v. Woidtke*, 224 Ill. App. 3d 791, 805 (1992)). " 'Evidence which tends to establish that the accused had a motive for killing the decedent is relevant, and if the evidence, at least to a slight degree, tends to establish the motive relied on, it is also competent.' " *Id.* (quoting *People v. Lucas*, 132 Ill. 2d 399, 427 (1989)).

¶ 76    An example is *People v. Tayborn*, 254 Ill. App. 3d 381, 383 (1993), where the defendant was found guilty of attempted first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm. Three days prior to the shooting at issue in that case, a fan and radio were taken from the victim's home and the victim learned that the defendant's brother stole the items. *Id.* The following day, the victim and the defendant's brother fist fought until the defendant's brother ran away. *Id.* Later that night, the victim was visiting his neighbor across the street from his house when he observed the defendant and another man run up to his house and break the front windows. *Id.* at 383-84. The victim ran to his house and the defendant stated, "is that the one?" *Id.* at 384. The other man pulled a gun out and attempt to shoot the victim, but the victim escaped. *Id.* The windows were boarded, but the next day, the boards were kicked down, the front door was open, and the television was stolen. *Id.* at 386. Two days later, about 1 a.m., the victim returned home and four men, including the defendant, fired about 60 shots into the victim's house. *Id.* at 384. On appeal, the defendant argued that the court erred in admitting evidence that the victim's house was burglarized by the defendant's brother, the victim fought with the defendant's brother, that the victim saw the defendant breaking the front windows of his home, and that his home was burglarized again after the windows were boarded. *Id.* at 388. The appellate court found the evidence tended to establish that the defendant's motive and intent to harm the victim for fighting with his brother. *Id.*

¶ 77　Notably, the *Tayborn* court found evidence of motive although it did not note any evidence that defendant knew of the fight between the victim and his brother or where the person who fought his brother lived prior to the charged offense. As such, we do not find such evidence necessary in every circumstance.

¶ 78　We also note that the concerns implicated by other bad acts evidence are not applicable to the school incident because the incident did not involve defendant. See, *Pikes*, 2013 IL 115171, ¶¶ 16, 20. The school fight was only between Martez and J.J.P. Thus, the admissibility of evidence of this incident "should be judged under ordinary principles of relevance." *Id.* ¶ 20. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 79　The prior instances provide retaliation motive that could be attributed to defendant. The current offenses occurred after Martez got into trouble for fighting with J.J.P at school, and the park incident provided the continuing narrative or explanation was to why there was hostility between J.J.P. and Martez. The fact that the two prior incidents occurred two weeks to a month prior "goes to the weight of the evidence rather than its admissibility." *People v. Pitts*, 299 Ill. App. 3d 469, 476 (1998). The Facebook photos and videos, as well as J.J.P.'s testimony that defendant acted in accordance with Martez at the park, demonstrated that Martez was friends with Carlos and defendant. Given defendant's connection to Martez, it is not wholly unreasonable to infer that defendant knew that Martez got into trouble at school due to fighting with J.J.P. Based on Martez and J.J.P. attending the same school and J.J.P.'s testimony that people from his school knew where his brothers lived, it is also plausible Martez knew J.J.P. frequented the victims' apartment and the location of the apartment. It therefore could be fairly inferred that Martez had

28

motive to enlist defendant and Carlos—the same people who initially helped Martez harm J.J.P.—to go to the victims' apartment to harm them or J.J.P.

¶ 80    Defendant's authority, *People v. Crawford*, 2021 IL App (5th) 170496, is distinguishable. In *Crawford*, the State charged the defendant with aggravated battery for striking Salathiel Johnson in the head with a beer bottle at a bar on April 3, 2016. *Id.* ¶ 4. A few days before the trial was to begin on that charge, the State filed additional charges related to a shooting that allegedly occurred between the defendant and Johnson's friend in the bar's parking lot after the bottle incident. *Id.* The court determined that the aggravated battery charge would be tried separately from the charges concerning the shooting and granted the defendant's motion *in limine* to bar the State from presenting any evidence of the shooting at the trial on aggravated battery. *Id.* ¶ 5. During such trial, the bar's security guard spoke of the shooting while answering one of defense counsel's questions. *Id.* ¶¶ 10, 18. The court agreed with the State that because of the security guard's answer to defense counsel's question, the State was allowed to elicit further detail of the shooting on redirect examination, which placed the entire event of the shooting before the jury. *Id.* ¶¶ 10, 19-21.

¶ 81    On appeal, the defendant argued that the court erred in failing to strike the security guard's off-the-cuff answer indicating a shooting occurred during counsel's questioning and in finding defense counsel opened the door to testimony regarding the shooting *Id.* ¶¶ 23, 25. The State argued that the testimony was admissible other-crimes evidence under the "continuing narrative" exception and that counsel opened the door to discuss the shooting. *Id.* ¶ 26. This court found the State forfeited its "continuing narrative" argument where it only cited authority recognizing the exception but failed to actually argue why such exception was applicable in the case. *Id.* ¶ 29. We also noted that evidence of the shooting "did not further explain the aggravated battery that occurred before the shooting." *Id.* ¶ 30. We then found the court erred in allowing the State to elicit

29

testimony regarding the details of the shooting where such testimony went beyond correcting unfavorable inferences left by defense counsel's examination. *Id.* ¶¶ 33-34, 38.

¶ 82    Unlike *Crawford*, the State here provided sufficient arguments that an exception applied. Moreover, the other-crimes evidence occurred before the charged offense and provided context to the school incident and a motive as to why defendant would commit the offenses. Without such evidence, the jury would be left to speculate why defendant would commit the offenses, especially where there was no evidence that the apartment was robbed. Given that the evidence only needed to—a slight degree—tend to show motive (*People v. Lucas*, 132 Ill. 2d 399, 427 (1989)), we find the court did not abuse its discretion in allowing testimony of defendant's prior bad acts.

¶ 83                                B. *De Facto* Life Sentence

¶ 84    Defendant also argues that his sentence was excessive and violated the proportionate penalties clause as applied to him. Defendant acknowledges that he forfeited these arguments by failing to raise them in a postsentencing motion. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, he requests plain error review.

¶ 85    Plain error review is warranted when "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 544. However, the court must first find evidence of clear error. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 86                                i. Excessive Sentence Claim

¶ 87    Defendant first challenges his sentence, arguing that his *de facto* life sentence of 106 years was excessive and did not reflect his rehabilitative potential. We note defendant's excessive sentence argument overlaps with arguments made for his as-applied proportionate penalties claim. To the extent that defendant argues his sentence was excessive based on the court's alleged failure

30

to consider *Miller* factors, we address such argument in the next section and consider only the argument of excessiveness here.

¶ 88   As to excessiveness, defendant contends that his sentence does not reflect his lessened culpability due to his age, upbringing, and potential for rehabilitation. He further argues he was convicted on a theory of accountability and there was no evidence he was the instigator of the crime.

¶ 89   In determining the sentence, the trial judge must consider all relevant factors in mitigation and aggravation, and "balance the retributive and rehabilitative purposes of the punishment." (Internal quotation marks omitted). *People v. Weiser*, 2013 IL App (5th) 120055, ¶¶ 31-32. However, the defendant's rehabilitation potential is not entitled to more weight than the aggravating factors. *Id.* ¶ 32. The trial court is afforded great discretion when imposing a sentence, because—unlike a reviewing court—it has an opportunity to weigh such factors as "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26. Consequently, a reviewing court may not overturn a sentencing decision because it might have weighed the factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentencing decision will be overturned only where a trial court abuses its discretion. *Id.* at 209-10. A sentence that falls within the statutory limits is presumed proper. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. The presumption is rebutted only where a defendant demonstrates that the sentence imposed "greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.*

¶ 90   The court here clearly considered the evidence before it, including the PSI report and argument regarding defendant's age, drug abuse, and mental health issues. It explicitly stated it considered the PSI report, which included defendant's age and discussion of defendant's drug

31

abuse and mental health issues along with medical records regarding the same. Defense counsel also argued defendant's age before the court imposed its sentence. The court was not required to give those factors more weight than it gives aggravating factors, such as one of the most important factors—the seriousness of the offense. *Weiser*, 2013 IL App (5th) 120055, ¶ 32.

¶ 91 While the State could not say for certain whether defendant fired the gun that struck either victim, defendant's argument that he was convicted based on an accountability theory downplays his involvement in these crimes. Defendant did not play a minor role in these crimes; rather, he was armed and threatened Jaleel as he forced his way into the doorway. Moreover, as the court noted, defendant had a criminal history, including violent offenses and offenses related to firearms. The record also indicates that the court considered defendant's potential for rehabilitation but found such potential lacking where it stated defendant was given opportunities to resolve mental health issues and his affinity for firearms but failed to do so. Given the records provided by the treatment centers, we cannot disagree with the court's conclusions.

¶ 92 As such, the court considered the relevant factors in mitigation and aggravation. On appeal, defendant essentially requests a reweighing of the sentencing factors, which this court may not do. See *People v. Perruquet*, 68 Ill. 2d 149, 156 (1977). Based on defendant's history, involvement in the crimes, and the nature of the crimes, we find the court did not abuse its discretion in sentencing defendant to a total of 106 years' imprisonment.

¶ 93                    ii. As-Applied Proportionate Penalties Claim

¶ 94 Defendant further claims that his sentence violates the proportionate penalties clause as applied to him, where scientific research showed that the brains of young adults continue to develop into their 20s and the trial court did not consider the *Miller* factors as codified in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2018)). Defendant

contends the court merely focused on the facts of the offense and his criminal history instead of considering his age and the fact that he was convicted under a theory of accountability where there was no evidence he was the instigator of the crime. He further notes that the majority of his criminal history was nonviolent and all but one occurred when he was a juvenile.

¶ 95    The proportionate penalties clause of the Illinois Constitution states, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A penalty violates the proportionate penalties clause if it is so severe that it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. *People v. Hilliard*, 2023 IL 128186, ¶ 20.

¶ 96    Over the last 20 years, the United States Supreme Court has determined that "that children are constitutionally different from adults for purposes of sentencing" due to children's "diminished culpability and greater prospects for reform." *Miller v. Alabama*, 567 U.S. 460, 471 (2012). In *Roper v. Simmons*, 543 U.S. 551 (2005), the Court found the eighth amendment prohibited imposition of the death penalty for all juvenile offenders. In *Graham v. Florida*, 560 U.S. 48, 74 (2010), the Court determined the eighth amendment prohibited life sentences without parole for juveniles who committed a nonhomicide offense. In *Miller*, the Court found the eighth amendment prohibited mandatory life without parole sentences for juveniles who committed homicides. *Miller*, 567 U.S. at 489. The Court later explained that *Miller* did not prohibit life sentences for juveniles who committed homicide offenses, but that the sentencing court must have discretion to consider youth and its attendant circumstances before imposing a life without parole sentence. *Jones v. Mississippi*, 593 U.S. 98, 109 (2021). Illinois has codified the relevant factors relating to

33

youth and its attendant circumstances, or the *Miller* factors, in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2022)).

¶ 97 The Illinois Supreme Court, in *People v. Buffer*, 2019 IL 122327, ¶¶ 27, 40, expanded *Miller* protections beyond natural life without parole sentences, and held *Miller* also applies to *de facto* life sentences, which is a prison sentence of more than 40 years. As such, before a court can sentence a juvenile to more than 40 years' imprisonment, it must consider the juvenile's youth and attendant circumstances. *Id.* ¶ 42.

¶ 98 The *Miller* line of cases only applies to juveniles, *i.e.*, those under the age of 18. *People v. Spencer*, 2025 IL 130015, ¶ 32. However, the Illinois Supreme Court has indicated that defendants are not foreclosed from asserting "as-applied *Miller*" claim. See *People v. Clark*, 2023 IL 127273, ¶ 87 ("this court has not foreclosed 'emerging adult' defendants between 18 and 19 years old from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development" (citing *People v. Thompson*, 2015 IL 118151, ¶¶ 1, 43-44, and *People v. Harris*, 2018 IL 121932, ¶¶ 1, 48)). Defendant here asserts such claim, which contemplates whether he, as a young adult offender, is entitled to *Miller* protections because his brain is more like a juvenile's than an adult's. See *Thompson*, 2015 IL 118151, ¶¶ 1, 44; *Harris*, 2018 IL 121932, ¶¶ 1, 48; *People v. House*, 2021 IL 125124, ¶¶ 29, 32.

¶ 99 The problem with defendant's argument is that even assuming his brain was more like a juvenile's than an adult's, the applicability of section 5-4.5-115 of the Unified Code of Corrections (730 ILCS 5/5-4.5-115 (West 2020)) to his case remedies any violation of *Miller*. Relevant here, section 5-4.5-115(b) of the Unified Code of Corrections (*id.* § 5-4.5-115(b)) provides that any person who was under 21 years old at the time of the commission of the offense and was sentenced

34

on or after June 1, 2019, is eligible for parole after serving 20 years if he or she committed first degree murder and was not sentenced to natural life imprisonment.

¶ 100 This court has held that "[t]he United States Constitution only requires nonhomicide juvenile offenders are provided 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *People v. Beck*, 2021 IL App (5th) 200252, ¶ 17 (quoting *Graham*, 560 U.S. at 75). In doing so, we noted that the *Miller* line of cases only address life sentences without parole. *Id.* ¶ 22. We further reasoned that the United States Supreme Court clarified that parole statutes can provide the necessary constitutional protections for juveniles as " 'parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.' " *Id.* ¶ 24 (quoting *Jones v. Mississippi*, 593 U.S. 98, 212 (2021)). We therefore conclude defendant's sentence of over 40 years of imprisonment was not unconstitutional where the parole statute afforded him "a meaningful opportunity for release based on his maturity and rehabilitation before a *de facto* life sentence of over 40 years' imprisonment." *Id.* ¶ 26.

¶ 101 The Illinois Supreme Court recently agreed with our *Beck* decision in *People v. Spencer*, 2025 IL 130015, ¶¶ 39-40. It determined that because the parole statute for young adults (730 ILCS 5/5-4.5-115(j) (West 2020)) provides "a meaningful opportunity to obtain release before *** 40 years in prison," a defendant subject to this statute was not given a *de facto* life sentence for *Miller* purposes. *Id.* ¶ 40.

¶ 102 Here, because defendant was 18 years old at the time of the offense and was sentenced after June 1, 2019, he may petition for parole—at the least—20 years into his sentence. 730 ILCS 5/5-4.5-115(b) (West 2022). Defendant therefore does not have a *de facto* sentence for the purpose

of *Miller* protections. See *Spencer*, 2025 IL 130015, ¶ 40. As such, any claim that the court needed to consider the *Miller* factors before imposing defendant's sentence fails.

¶ 103 We note, as stated in *Spencer*, that the inapplicability of *Miller* to defendant does not preclude a proportionate penalties claim. *Id.* ¶ 42. "A defendant may challenge a sentence of any length" under the proportionate penalties clause. *Id.* ¶ 43. The *Spencer* court further indicated that such claim could possibly rely on "the evolving science regarding juvenile maturity and brain development." *Id.* However, because all as-applied claims depend "on the application of the law to the specific facts and circumstances," a sufficiently developed record is required. (Internal quotation marks omitted.) *Id.* ¶ 44.

¶ 104 Defendant here argues there is a sufficiently developed record where trial counsel referenced an emerging adult argument at sentencing, and the record contains an extensive PSI report illustrating the difficult childhood that defendant endured that could have led him down the wrong path, including voluminous medical records documenting his extensive mental health struggles. We disagree.

¶ 105 "[A] reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Harris*, 2018 IL 121932, ¶ 41. Here, while there was evidence of defendant's background, there were no findings of fact, including any findings regarding scientific studies regarding young adult brains compared to defendant's circumstances and brain. Indeed, defendant cites several specific studies that were never presented to the trial court. Accordingly, we find any further as-applied proportionate penalties claim or ineffective assistance claim based on the failure to assert an as-applied claim is premature and better suited for postconviction proceedings. *Spencer*, 2025 IL 130015, ¶ 45.

¶ 106　As noted above, under both prongs of the plain error doctrine, defendant must first show a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Here, no error is shown, and therefore, the procedural default will be honored. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). As such, we affirm the sentences imposed by the trial court.

¶ 107　　　　　　　　　　　　C. Consecutive Sentencing

¶ 108　Defendant lastly argues that the court here failed to make the necessary finding of "severe bodily injury" under section 5-8-4(d)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(1) (West 2022)) to trigger mandatory consecutive sentencing where the court only found "great bodily injury" on the home invasion count and "severe bodily harm" for the aggravated battery count. He contends courts have continuously held that the difference between "great bodily harm" and "severe bodily injury" is not merely semantic, but that they are "entirely distinct concepts." *People v. Ramirez*, 2015 IL App (1st) 130022, ¶ 30; see also *People v. Williams*, 335 Ill. App. 3d 596, 599-600 (2002). Relying on *Ramirez*, 2015 IL App (1st) 130022, and *Williams*, 335 Ill. App. 3d 596, defendant argues that "harm" and "injury" are different words with different meanings and the legislature intended the court find "severe bodily injury."

¶ 109　Defendant again acknowledges that he forfeited this argument by failing to raise it in a postsentencing motion (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *Hillier*, 237 Ill. 2d at 544) and requests plain error review. As explained above; to obtain relief under plain error review, defendant must first show clear error occurred. *Nicholas*, 218 Ill. 2d at 121.

¶ 110　The State first contends that defense counsel invited any error in the failure to make a severe bodily injury finding by agreeing there was severe bodily injury in this case. We disagree.

¶ 111   "[U]nder the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." (Internal quotation marks omitted.) *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). We find in the context of defense counsel's statements at the sentencing hearing as a whole, defense counsel never agreed that defendant inflicted severe bodily injury. Rather, counsel agreed that consecutive sentences were mandatory if the court found defendant inflicted severe bodily injury. Accordingly, we address the merits.

¶ 112   Section 5-8-4(d)(1) requires mandatory consecutive terms where "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2022). We find defendant's cited authority *Ramirez* and *Williams* inapplicable.

¶ 113   We first note that *Ramirez*, 2015 IL App (1st) 130022 has since been vacated. *People v. Ramirez*, 50 N.E.3d 1136 (Ill. 2016). Nevertheless, in *Ramirez*, the State argued the trial court erred in imposing concurrent sentences rather than consecutive sentence where the jury's finding that the defendant's conduct constituted great bodily harm under the aggravated battery statute was "sufficient to constitute 'severe bodily injury' within the meaning of section 5-8-4(d)(1) of the Unified Code of Corrections." *Ramirez*, 2015 IL App (1st) 130022, ¶ 29. The *Ramirez* court disagreed (*id.* ¶¶ 31-32) and relied on *Williams*, which stated that "severe bodily injury" found in the mandatory consecutive statute meant something more than the "great bodily harm" found in the aggravated battery statute based on the principle that the legislature intends different results when it "uses certain words in one instance and different words in another." *Williams*, 335 Ill. App. 3d at 599-600. The sentencing court in *Williams* imposed consecutive sentences with no explanation as to why. *Id.* at 601. As such, the appellate court remanded to the sentencing court to ensure it considered whether the injuries in that case constituted "severe bodily injury." *Id.*

38

¶ 114   Unlike *Williams*, there was a finding in this case. This case is also not like *Ramirez* where the State was trying to equate "great bodily injury" with "severe bodily injury." Here, the trial court's actions demonstrated its knowledge of a difference between "great" and "severe" bodily injury. On the home invasion conviction, the trial court found that Jaleel suffered "great bodily harm" from defendant's conduct, which triggered the provision requiring that he serve his sentence at 85%, rather than 50% (730 ILCS 5/3-6-3(a)(2)(iii) (West 2018)). It then separately addressed mandatory consecutive sentencing and found that Jaleel suffered "severe bodily harm." Thus, the trial court knew that a finding of "great bodily harm" was not sufficient to trigger the consecutive sentencing requirement.

¶ 115   While defendant contends the "severe bodily harm" found by the court and the "severe bodily injury" stated in the statute have different meanings, he fails to explain how the two terms differ. We fail to see a meaningful difference.

¶ 116   Black's Law Dictionary defines "harm" as "Injury, loss, damage; material or tangible detriment." Black's Law Dictionary (12th ed. 2024). The dictionary list three definitions for "injury," but the pertinent one in the context of section 5-8-4 is "Any harm or damage." *Id.* Black's Law Dictionary acknowledges "[s]ome authorities distinguish harm from injury, holding that while harm denotes any personal loss or detriment, injury involves an actionable invasion of a legally protected interest." *Id.* Such distinction is inapplicable in the context of the phrase "severe bodily injury" or "severe bodily harm." Indeed, those two terms are defined similarly. "Bodily injury" is defined as "Physical damage to a person's body," and "bodily harm" is defined as "Physical pain, illness, or impairment of the body." *Id.*

¶ 117   Several Illinois cases have discussed section 5-8-4 in terms of "severe bodily *harm*" (see *People v. Barajas*, 322 Ill. App. 3d 541, 557 (2001); *People v. Parker*, 141 Ill. App. 3d 643, 646

(1986); *People v. Vue*, 353 Ill. App. 3d 774, 782 (2004); *People v. Biesiada*, 201 Ill. App. 3d 39, 46 (1990)), including a case from the Illinois Supreme Court (see *People v. Phelps*, 211 Ill. 2d 1, 15-16 (2004)). Even defendant's authority, *Williams*, 335 Ill. App. 3d at 599, once stated "severe bodily harm" in reference to section 5-8-4. Moreover, in explaining that "great bodily harm" and "severe bodily injury" were different, *Williams* stated "[b]ecause 'great bodily harm' defines an offense, while 'severe bodily injury' mandates consecutive sentencing, we conclude 'severe bodily injury' requires a degree of *harm* to the victim that is something more than that required to create the aggravated battery offense." (Emphasis added.) *Id.* at 600. Accordingly, we find the trial court's use of the word "harm" rather than "injury" does not suggest, much less establish, a clear or obvious error.

¶ 118   Because no clear error is shown, the procedural default will be honored. *Naylor*, 229 Ill. 2d at 593. As such, we affirm defendant's sentences.

¶ 119                                    III. CONCLUSION

¶ 120   J.J.P.'s testimony was properly presented for a purpose other than to show defendant's propensity to commit crimes. Defendant failed to show his sentence was excessive or violated *Miller*, and the court made the proper findings to impose consecutive sentences. Any further proportionate penalties claim is more appropriate for postconviction proceedings. Accordingly, we affirm defendant's convictions and sentences.


¶ 121   Affirmed.